**SPEAR, LEEDS & KELLOGG,**
**Plaintiff–Appellee,**

v.

**CENTRAL LIFE ASSURANCE COMPANY, Alexander Hamilton Life Insurance Company of America, Inc., Canada Life Assurance Co., Defendants–Appellants.**

No. 331, Docket 95-7372.

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1995.

Decided May 16, 1996.

J. Michael Vaughan, Kansas City, Missouri (Heidi R. Youngs, Weisenfels & Vaughan, Kansas City, Missouri; John J. Phelan, III, New York City, of counsel), for Defendants–Appellants.

Howard Schiffman, New York City (Woody N. Peterson, Dickstein, Shapiro & Morin, New York City, and Washington, DC; David Yeres, Rogers & Wells, New York City, of counsel), for Plaintiff–Appellee.

Before CARDAMONE and MAHONEY, Circuit Judges and POLLACK,* District Judge.

Judge POLLACK dissents in a separate opinion.

CARDAMONE, Circuit Judge:

On this appeal from the grant of a preliminary injunction enjoining arbitration, issued by the United States District Court for the Southern District of New York (Duffy, J.), we are asked to decide whether plaintiff Spear, Leeds & Kellogg (plaintiff, broker, or Spear, Leeds), a member of the New York Stock Exchange (N.Y.SE or Exchange), is required under the Exchange's Constitution and Arbitration Rules to arbitrate a dispute with the defendants-appellants Central Life Assurance Company, Alexander Hamilton Life Insurance Company of America, Inc., and Canada Life Assurance Company (defendants, appellants, or insurance companies). None of the defendants are Exchange members. The district court granted the injunction barring arbitration because it found there was no contract between the parties to arbitrate.

In so ruling the district judge relied on our decision denying arbitration in *Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.,* 728 F.2d 577 (2d Cir.1984). There, the dispute—unrelated to exchange business—was between defendants that were not NYSE members and a plaintiff that was a member. We held that because the alleged improper conduct was by the non-member, arbitration should be limited to those dis-

* Hon. Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation.

putes that come about as a result of the member's exchange-related business. *Id.* at 580. The dispute before us today arises between a member and non-member of the Exchange, but unlike *Paine Webber,* the non-member is the alleged victim of the member's conduct, and the dispute *is* related to the member's exchange activities. In our view the instant dispute is arbitrable. Accordingly, we reverse.

## BACKGROUND

Spear, Leeds—as a registered futures commission merchant and a member of the NYSE—agreed upon joining the NYSE to act in accordance with its Constitution and Arbitration Rules. The three life insurance companies defendants are not members of the Exchange, but have demanded arbitration pursuant to the Exchange's Constitution and Rules. *See Spear, Leeds & Kellogg v. Central Life Assurance Co.,* 879 F.Supp. 403 (S.D.N.Y.1995). In order to understand the legal issues raised on this appeal, a brief discussion of the underlying facts is necessary.

### I Facts

Spear, Leeds opened an account and several sub-accounts on behalf of Marvin Goodman in November 1990. Goodman, previously a customer of Balfour Maclaine Futures, Inc. (another registered futures commission merchant), was reputed to be a successful commodities trader, trading for his own account, for his family, and for a rather sizeable select group of clients. When a background check disclosed no financial or regulatory problems associated with Goodman, Spear, Leeds accepted him as a customer.

Goodman's clients' accounts were listed on Spear, Leeds records as "sub-accounts" of Goodman's account. As such, the accounts were charged a lower commission rate. Professing concern that should he die suddenly, delays in the probate of his estate might create certain risks in his sub-account arrangement, Goodman purchased life insurance and put it in irrevocable trusts so that upon his death his clients would immediately be paid the equity balances in their accounts.

At the end of 1990 the trusts held $20 million of life insurance on Goodman's life.

Because of his expanding commodity trading business, Goodman set out in 1991 to augment this life insurance plan. The three insurance companies were persuaded to issue additional life insurance policies totalling $3 million. To obtain this additional insurance Goodman was required to explain his method of trading and why he needed additional insurance. Thus, he provided defendants with detailed financial information regarding his accounts at Spear, Leeds. Defendants were shown the broker's account statements with significant positive account balances— between $17.5 and $20.5 million dollars.

Goodman's plans for the protection of his clients' financial security did protect them on his untimely death, but for the defendant insurance companies, Goodman's plans proved to be fraudulent. *See Spear, Leeds,* 879 F.Supp. at 404. And, according to the defendants, Spear, Leeds played a vital role in helping Goodman defraud them. The broker generated and mailed monthly account statements to Goodman and his clients. These account statements—subsequently provided to the insurance companies by Goodman—provided a basis for them to extend the additional insurance to Goodman.

According to the defendants, the monthly profits noted in the sub-account statements were illegitimate, a reflection of "arbitrary and concocted directions" from Goodman that bore no relation to his actual trading. The insurance companies further allege that the broker made numerous errors in maintaining its account records. It did not segregate the balances of Goodman's sub-accounts, as shown on the face of the statements, and instead listed the accounts on a "net basis." This resulted in substantial overstatements of actual account balances. Because the accounts were carried on a "net basis" rather than a "gross basis," defendants never learned Goodman's true financial status before issuing the life insurance policies. Hence, Spear, Leeds is charged by defendants with preparing and mailing misleading and false monthly statements that obscured Goodman's trading activities and the reality of his financial condition.

In August 1991 the NYSE, while conducting a routine investigation, discovered Goodman's fraud. Jeffrey Zinn, an Exchange investigator, was alerted by the unusual number of sub-accounts (approximately 86) that Goodman had with Spear, Leeds. The broker stated it knew only of Goodman's interest in the accounts, but it acknowledged mailing statements concerning the many sub-accounts to others. Although Spear, Leeds had the names and addresses for mailing purposes, it maintained no opening account documents establishing these sub-accounts. The broker stated that Goodman was its customer—not the sub-account parties—and conceded that his total account balance was actually closer to $2 million than the $17–$20 million presented to defendants by Goodman.

The Commodity Futures Trading Commission (Commission) also instituted an enforcement action and froze Goodman's assets. On December 17, 1991, before the conclusion of the Commission's proceedings, Goodman died. Accordingly, under the terms of the insurance trusts, Goodman's investment clients received payments from the insurance companies equal to the equity the clients thought they had in the Spear, Leeds sub-accounts. Defendants argue that these insurance monies saved Goodman's clients, the individual victims of the fraud, from any loss, and in fact provided them with a windfall.

## II Procedural History

These developments led to three actions between Spear, Leeds and the insurance companies. First, the insurance companies filed an arbitration claim before the NYSE on December 15, 1993, seeking to recover against Spear, Leeds in accordance with the NYSE Constitution and Rules. The essence of that claim is that the broker participated in Goodman's fraudulent scheme by issuing false and misleading account statements to Goodman and his customers. Because the insurance companies would not have issued the life insurance policies without these favorable account statements, they asserted, their losses were directly caused by the broker's actions. The statement of claim seeks relief on the basis of common law theories—

principally negligence and fraud—as well as under 18 U.S.C. § 1962(a), (c), (d) (civil RICO), pointing to specific findings made by the NYSE in the course of its investigation. It refers to Spear, Leeds' violations of NYSE rules and its consent to the imposition of a $75,000 fine and a censure by the NYSE. The Commission also reached an agreement with Spear, Leeds under which the broker consented to a $325,000 penalty and its managers were fined and suspended for their activities in connection with Goodman's account. The three insurance companies sought damages totalling just over $1.9 million.

In order to avoid arbitration, plaintiff filed the instant action in the Southern District of New York and moved for a preliminary injunction enjoining the insurance companies from compelling arbitration. A week later, the insurance companies instituted an action in the United States District Court for the District of Nebraska (the situs of the proposed arbitration) seeking to compel arbitration under the Federal Arbitration Act (FAA), 9 U.S.C. § 4 (1994). On March 9, 1994 the parties agreed to stay the Nebraska action and to be bound by the arbitrability determination in the New York action now before us.

The district court decided the case on March 30, 1995. It found no contract to arbitrate, and that in its absence and the absence of any transactional nexus between Spear, Leeds and the insurance companies, compelling arbitration would be inappropriate. *See Spear, Leeds,* 879 F.Supp. at 406. From the order granting an injunction staying arbitration, the insurance companies appeal.

## DISCUSSION

### *Historical Background*

Jurisprudence in the securities field has stressed the long history of self-regulation of the stock exchanges. *See, e.g., Silver v. NYSE,* 373 U.S. 341, 349–57, 83 S.Ct. 1246, 1252–57, 10 L.Ed.2d 389 (1963). Before the advent of federal securities law the various stock and commodity exchanges functioned like private clubs, exercising internal discipline with little political or judicial oversight.

In the 1700s, the lack of oversight led to scandals like the South Sea Bubble, in which thousands of English and French investors were ruined. Louis Loss & Joel Seligman, *Securities Regulation* 1–2 (3d ed.1995). Unscrupulous persons in this country in the 1800s sold securities and land to gullible investors, like Martin Chuzzlewit, who thought he was buying into a new and growing American metropolis called the Valley of Eden, but whose investment turned out to be one in a dense forest located in a poisonous swamp. Charles Dickens, *Martin Chuzzlewit* (Part One) 443–464 (Peter Fenelon Collier & Son 1900) (1844). Similar conduct early in the present century, together with the increasingly important role of the national exchanges in the nation's economy, made ungoverned self-regulation and the private club analogy inadequate and inapposite. *See Silver*, 373 U.S. at 351, 83 S.Ct. at 1253–54.

To respond to this inadequacy and the grave consequences attending it, Congress enacted securities laws allowing enhanced government supervision of national exchanges. But the new government role did not displace the tradition of self-regulation; Congress' aim was to have the exchanges take the lead, with the government in reserve. In other words, " '[g]overnment would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used.' " *Silver*, 373 U.S. at 352, 83 S.Ct. at 1254 (quoting Douglas, *Democracy and Finance* 82 (Allen ed.1940)). One aspect of the securities laws' design therefore was for the exchanges to play a major role in curbing abuses by obligating them to regulate themselves. This required the exchanges to formulate rules governing exchange members' activities and conduct. *Id.* at 353, 83 S.Ct. at 1254–55. An unavoidable side-effect is that enforcement of such rules inevitably "sweep[s] ... nonmembers into the currents of the Exchange's process of self-regulation." *Silver*, 373 U.S. at 356, 83 S.Ct. at 1256–57.

## I  The Arbitration Agreement

■ With this background in mind, we pass to the merits. Whether or not a matter is arbitrable is a matter for judicial determination. *See AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986); *see also First Options of Chicago, Inc. v. Kaplan*, —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (holding that questions of arbitrability are decided by courts unless a contract unmistakably provides otherwise).

■ It is established law that the issuance of a preliminary injunction is to be reversed only when we conclude that the district court abused its discretion by applying incorrect law, basing its decision on a clearly erroneous finding of fact, or making an error in the substance or form of the injunction it issued. *See Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 315 (2d Cir.1982). It is equally familiar law that a party seeking a preliminary injunction

> must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.

*Able v. United States*, 44 F.3d 128, 130 (2d Cir.1995) (per curiam) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). The district court found irreparable harm, and this conclusion is not challenged on appeal. Consequently, our analysis concerns the second part of the preliminary injunction showing.

■ Our initial task is to determine whether Spear, Leeds entered into an agreement to arbitrate. Only when an agreement to arbitrate is found to exist does a court proceed to decide whether a given dispute falls within the scope of that agreement. These two inquiries are separate and independent. *Cf. McMahan Sec. Co. v. Forum Cap. Mkts. L.P.*, 35 F.3d 82, 86–89 (2d Cir.

1994); *Haviland v. Goldman, Sachs & Co.,* 947 F.2d 601, 604 (2d Cir.1991), *cert. denied sub nom. J. Aron & Co. v. Haviland,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992).

The district court focused on whether any relationship existed between Spear, Leeds and defendants. It looked for some nexus, such as an agreement, some sort of transaction, or a relationship involving Spear, Leeds and the insurance companies. It found none. The district court concluded that the absence of such a nexus was fatal to defendants' case. *See Spear, Leeds,* 879 F.Supp. at 405. It therefore held that Spear, Leeds had never agreed to arbitrate any disputes between itself and the life insurance companies. The trial court went on to hold that the test for granting a preliminary injunction was satisfied because plaintiff would suffer irreparable harm if it were required to arbitrate without having agreed to do so, and because the absence of an agreement to arbitrate demonstrated a likelihood of Spear, Leeds' success on the merits.

While it is true that the broker and defendants never directly contracted with one another, we have explained that the arbitration rules of a securities exchange are themselves "contractual in nature." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,* 903 F.2d 109, 113 (2d Cir.1990). Because Spear, Leeds is a NYSE member, the appropriate question is whether defendants can invoke the Exchange Rules as third party beneficiaries. To answer this question we must examine the NYSE Constitution and Rules.

As pointed out earlier, by joining the New York Stock Exchange, Spear, Leeds agreed to abide by the Exchange's Constitution and Arbitration Rules. The Constitution provides that "any controversy between a member ... and any other person arising out of the business of such member ... shall at the instance of any such party be submitted for arbitration." NYSE Const. art. XI, § 1. Rule 600(a) of the NYSE Arbitration Rules further states

Any dispute, claim or controversy between a ... non-member and a member ... arising in connection with the business of such member ... shall be arbitrated under the Constitution and Rules of the [NYSE] as provided by any duly executed and enforceable written agreement or upon the demand of the ... non-member.

Hence, the Rules create enforceable contract rights for non-members in certain specified circumstances. No agreement is required between the parties to the arbitration before a non-member may invoke Rule 600(a). Rather, Rule 600(a) explicitly provides that a "demand" by a non-member is an alternative basis for arbitration, separate from a "duly executed and enforceable written agreement" providing for arbitration.

This reading is bolstered by prior decisions that make clear that "the arbitration rules of an exchange are sufficient to compel arbitration of exchange-related disputes *in the absence of a specific written arbitration agreement.*" *Georgiadis,* 903 F.2d at 113; *see also Paine, Webber,* 728 F.2d at 580 (arbitration provisions of the NYSE Constitution and Rules are sufficient in and of themselves to compel arbitration of covered disputes regardless of whether they are incorporated in a separate agreement). We have also held—in the context of the National Association of Securities Dealers (NASD) Code—that a third party can rely on a similar rule to compel arbitration of a dispute with a NASD member. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership,* 41 F.3d 861, 864 (2d Cir.1994); *cf. Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 n. 2, 111 S.Ct. 1647, 1651 n. 2, 114 L.Ed.2d 26 (1991) (requiring arbitration between a NYSE member and a registered securities representative (a non-member) on the basis of an agreement with a third party—the stock exchange). Hence, decisional law recognizes that the FAA requires the enforcement of an arbitration agreement not just in favor of parties to the agreement, but also in favor of third party beneficiaries of the members' agreement to abide by the Exchange's Constitution and Rules when they join the NYSE.

The dissenting opinion relies on *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814 (11th Cir.1993) in opposition to the third party beneficiary approach used here. How-

ever, *Wheat* is not good law in our Circuit, as it questions *Paine, Webber,* one of our first occasions to invoke third party beneficiary theory in this context. *See Wheat,* 993 F.2d at 820 (noting that *Paine, Webber,* raises a "tantalizing question"). Naturally, we do not consider the matter open for further debate; third party beneficiary theory is the law.

Therefore, we believe the insurance companies are entitled, as third party beneficiaries of an arbitration agreement, to insist on arbitration.[1] Spear, Leeds and our dissenting colleague seem to argue that because the parties in many of the prior decisions happened to have contractual relationships, these precedents are not controlling in this petition for arbitration of tort claims including fraud and negligence. But there is no principled reason why the instant tort claims are not susceptible to the same sort of analysis used for contract claims. The insurance companies, as beneficiaries of the contract entered into by Spear, Leeds, are not limited to a contract cause of action before the arbitrators. Although in *Paine, Webber,* 728 F.2d at 581, we held that the NYSE Rules did not cover a particular dispute between a member and a non-member, we did imply that those rules could serve as an agreement to arbitrate some tort claims, including common law fraud and negligent misrepresentation. *See id.* at 578, 580. In *Fleck v. E.F. Hutton Group, Inc.,* 891 F.2d 1047, 1048, 1054 (2d Cir.1989), we stated that Rule 600(a) might require a NYSE "associated person" to arbitrate a tort dispute with a non-member at the non-member's request even though the alleged torts were committed months after the litigants' contract terminated. And, in *Gilmer,* 500 U.S. at 23, 111 S.Ct. at 1650–51, arbitration of a claim under the Age Discrimination in Employment Act (ADEA), akin to a tort claim, was required.

Aside from these cases, the express language of Rule 600(a) does not require a contract between parties to a controversy as a precondition to arbitration, nor does it limit the scope of arbitration to contractual questions. It simply requires a non-member's demand for arbitration of a claim that concerns the business of a member. Indeed, tort law may be where non-members most need NYSE protection because parties contracting directly with NYSE members always have the option to include an arbitration clause in their contract, thereby making clear under what circumstances arbitration may be invoked. Victims of an Exchange member's tort, on the other hand, may lack the luxury of that option.

It may frequently be the case that non-members making allegations of wrongdoing prefer to litigate tort disputes in court because of the protections of the jury system and the frequent unavailability of certain remedies in arbitration, for example, punitive damages. *See, e.g., Barbier v. Shearson Lehman Hutton Inc.,* 948 F.2d 117, 122 (2d Cir.1991). But this preference by many for a judicial forum does not mean that arbitration is unavailable as a forum for those who, like the insurance companies, choose it.

Although the trial court held that defendants failed to show a transactional nexus between themselves and plaintiff sufficient to warrant arbitration, *see Spear, Leeds,* 879 F.Supp. at 406, defendants' lack of direct contact with plaintiff does not prevent them from asserting their rights as third party beneficiaries. While identification of a beneficiary may help resolve whether he is an intended or an incidental beneficiary, *see* Restatement (Second) of Contracts § 308 cmt. a (1981), a beneficiary need not be identified prior to seeking enforcement of its rights under a contract. *See Owens v. Haas,* 601 F.2d 1242, 1250 (2d Cir.), *cert. denied sub. nom County of Nassau v. Owens,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979);

---

**1.** Our dissenting colleague incorrectly asserts that we believe the insurance companies are "third party beneficiaries of the settlement of the life insurance payments on Goodman's death to the designated beneficiaries of the life insurance that Goodman purchased." (dissent, at 31). As just noted, the insurance companies are third party beneficiaries to the contract between SLK and the NYSE. Further, we are not attempting to place the insurance companies in "Goodman's shoes," as the dissent alleges. Although the insurance companies briefly made a similar argument to the district court, they did not rely on this argument on appeal, and at any rate, the argument plays no role in our analysis. Therefore, the dissent's multiple references to equitable subrogation are inapposite.

Restatement (Second) of Contracts § 308 (1981).

Neither a transactional nexus between plaintiff and defendants, nor identification of these specific defendants as third party beneficiaries, is required to compel Spear, Leeds to arbitrate a dispute in accordance with NYSE procedures. Thus, the NYSE's Arbitration Rules provide a sufficient basis for finding the necessary agreement to arbitrate defendants' claims as prescribed by § 4 of the FAA.

## II  Scope of the Agreement

### A.  *Principles of Arbitrability*

■ Having answered the initial question of whether Spear, Leeds entered into an agreement to arbitrate in the affirmative, we turn to the second inquiry: whether the present dispute between plaintiff and defendant falls within the scope of that agreement. Certain understandings govern any discussion of arbitrability. First, and most importantly, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Another way of expressing this is to say that arbitration must not be denied unless a court is positive that the clause it is examining does not cover the asserted dispute. *See AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419.

■ Second, because we are interpreting a contract, our construction must ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 29 (2d Cir.1995). Despite the presumption of arbitrability, the strong federal policy favoring arbitration may not extend the reach of arbitration beyond the intended scope of the clause providing for it. *See Fuller v. Guthrie,* 565 · F.2d 259, 261 (2d Cir.1977).

Third, analysis may not intrude on the merits of the insurance companies' claims against the broker. After all, the NYSE Rules constitute an agreement "to submit all grievances to arbitration, not merely those which the court will deem meritorious." *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). An assessment of the merits of the case would run afoul of this principle. Although the district court and our dissenting colleague apparently were unimpressed with the merits of defendants' theories of plaintiff's liability, the validity of defendants' legal argument is not pertinent to the present inquiry.

### B.  *Exchange–Relatedness*

With these precepts in mind, we undertake to determine whether the dispute between Spear, Leeds and the insurance companies is within the scope of the NYSE provisions. According to Rule 600(a), the broker must, upon the demand of a non-member, arbitrate claims or controversies that "aris[e] in connection with the business [of the broker]." This language has been frequently interpreted. In *Paine, Webber,* 728 F.2d at 580, for example, we explained that when the alleged improper conduct is on the part of the non-member, only those controversies "arising out of the member's exchange-related business" must be arbitrated.

We offered two reasons for this view. The first reason is that the NYSE Rules require disputes between members to be arbitrated when they concern "any controversy," whereas in the context of a member-non-member dispute there is the additional requirement that the dispute arise in connection with the member's business. By reading this language as prescribing that the controversy be exchange-related, we avoid the anomaly of having two differently worded rules that are construed as having the same meaning. Hence, the exchange-relatedness requirement allows us to enforce faithfully the parties' expectations by providing a more restrictive scope for the member-non-member provisions than for intramural disputes. *Id.* at 580.

The second reason is that to extend Rule 600(a) to cover controversies not arising out of exchange-related business between mem-

bers and non-members would work a substantial injustice with respect to the reasonable expectations of Exchange members. It would require a member, upon a non-member's demand, to arbitrate any dispute. We do not believe that members could reasonably be said to have anticipated such a result. *Id.* at 580–81.

At any rate, all of this is settled law, and were we faced with a case involving a non-member's attempt to compel a member to arbitrate a claim of non-member wrongdoing, our path would be clear: If the claim involved the member's exchange-related business, we would compel arbitration. However, whether a member accused of wrongdoing might be compelled to arbitrate even when the controversy does *not* involve exchange-related business was a question left open in *Paine, Webber.* We speculated in that case that the mandate of self-regulation Congress imposed on the NYSE and other exchanges might permit a broader reading of Rule 600(a) in this different context. *Id.* at 580 n. 5.

Both parties have briefed and argued this unresolved question. Defendants point to two cases from other courts, decided after *Paine, Webber,* that find no requirement for exchange-relatedness in similar circumstances. In *Pearce v. E.F. Hutton Group, Inc.,* 828 F.2d 826, 832 (D.C.Cir.1987), it was held that while it would be anomalous for a non-member accused of wrongdoing to invoke the benefits of a NYSE arbitration when its actions did not involve exchange business, there was no anomaly in compelling an exchange member accused of wrongdoing to participate in a NYSE arbitration. The New York Court of Appeals reached a similar conclusion, noting that the strong policy reasons behind the placement of an exchange-relatedness gloss on the literal language of Rule 600(a) did not apply in this different context. *Nomura Sec. Int'l, Inc. v. Citibank, N.A.,* 81 N.Y.2d 614, 620, 601 N.Y.S.2d 448, 619 N.E.2d 385 (1993).

However, we decline the invitation to decide if Rule 600(a) demands that the non-member show exchange-relatedness, and leave open this question originally posed in *Paine Webber.* Instead, because we are per-

suaded that the controversy at hand does in fact arise out of Spear, Leeds' exchange-related business, we need not decide whether the defendants could have had their dispute arbitrated, were it not exchange-related.

## C. *Instant Controversy Exchange–Related*

Several considerations persuade us that the facts of this controversy arise out of plaintiff's exchange-related business. Although in deciding arbitrability, as earlier noted, we do not consider the merits of the defendants' claims or the ultimate likelihood that they will succeed at arbitration, examination of their claims reveals that matters concerning the NYSE are implicated. The insurance companies argue that absent plaintiff's wrongdoing in supervising Goodman's accounts, they would not have suffered a loss. They point to violations of various NYSE rules, including Rule 401 (members must adhere to principles of good business practice) and Rule 342(b) (members must institute supervisory controls and internal review systems), and conclude that the violation of these rules led to their injury. While an alleged violation of exchange rules will not always allow a dispute to be the subject of a NYSE arbitration, it does strongly support a conclusion of exchange-relatedness. The NYSE obviously considered plaintiff's actions exchange-related. This is evidenced by the investigation and the subsequent consent agreement. It also belies the dissent's suggestion that the NYSE would likely consider this matter "remote" (dissent, p. 34 n. 2) or unrelated to its regulatory responsibilities. In *Pearce,* the D.C. Circuit found it significant in its analysis that the NYSE investigated the member concerning the controversy that the non-member sought to arbitrate. *Pearce,* 828 F.2d at 831 n. 2.

Further, because plaintiff entered into a consent agreement with the NYSE as a result of the investigation, it is more difficult for it to argue that the dispute with defendants is not exchange-related. The NYSE concluded that plaintiff violated Exchange Rule 401, which requires members to "adhere to the principles of good business practice in the conduct of [their] business affairs." The NYSE also found a violation of Rule

342(b) based on plaintiff's failure to "provide for appropriate supervisory control" and to "establish a separate system of follow-up and review to determine that the delegated authority and responsibility is being properly exercised." In *Paine, Webber,* 728 F.2d at 581, we observed that "the substantial interest of the exchange in the sound and proper management of its member firms justified . . . arbitration." The defendants' claim here is partly based on the broker's improper management practices. It is also of some relevance that we pointed to disputes concerning Rules 401 and 342(b) as examples of "internal matters that . . . receive the watchful attention of the exchange" that would likely be deemed exchange-related. *Id.* at 581 & n. 7.

The Exchange's findings arose out of plaintiff's actions relating to Marvin Goodman and his numerous sub-accounts. The Exchange ruled that plaintiff "failed to maintain any new account documentation or other records with respect to the individuals named in the Dual Name sub-accounts although they were receiving duplicate sub-account statements." The report of the Exchange's hearing panel makes clear that Spear, Leeds never verified Goodman's explanation for establishing so many sub-accounts, nor did plaintiff or its managers investigate numerous other unusual aspects of Goodman's trading. While not passing on the merits of defendants' claims against plaintiffs, that they arise out of the same alleged wrongdoing that the NYSE investigated lends support to a conclusion of exchange-relatedness. We briefly note that despite the dissent's contention, the payment of death benefits by the defendants to Goodman's clients in no way contributed to our finding of exchange-relatedness (dissent, p. 31). Our conclusion rests instead on the reasons just articulated.

Any doubts that may remain as to the arbitrability of this controversy must be resolved in favor of arbitration because of the strong presumption discussed earlier favoring that forum. Moreover, obliging a NYSE member to arbitrate a dispute so closely connected with behavior investigated and punished by the exchange may hardly be said to violate a member's reasonable expecta-tions. *Cf. Leadertex,* 67 F.3d at 29. While plaintiff might not have known the specific parties that would be harmed by its violation of Exchange rules, it should reasonably have expected that a failure to obey NYSE rules would lead a party aggrieved by its conduct to seek arbitration of a claim arising from it. Our decision today also strengthens the presumptive partnership between courts and the national exchanges by allowing and facilitating vigorous self-regulation. *See Silver,* 373 U.S. at 352, 83 S.Ct. at 1254; *Paine Webber,* 728 F.2d at 581.

For all of these reasons, the instant controversy is exchange-related. As members should reasonably expect to be haled before an Exchange arbitration when their conduct violates Exchange rules and leads to Exchange investigations and penalties, we are implementing the reasonable expectations of the parties. Even if the narrower scope of the NYSE Rules governing arbitration between members and non-members warrants an "exchange-related business" requirement, the strong policy favoring self-regulation by exchange members suggests that a broad set of disputes are exchange-related when the NYSE member is the actor against whom arbitration is sought.

## CONCLUSION

Accordingly, in light of our conclusion that the instant controversy falls within the scope of a valid arbitration agreement, it necessarily follows that plaintiff has shown neither a likelihood of success on the merits, nor a sufficiently serious question going to the merits along with a balance of hardships tipping decidedly toward it to warrant the grant of a preliminary injunction barring arbitration. The order enjoining arbitration is therefore reversed and the case remanded to the district court for further proceedings not inconsistent with this opinion.

MILTON POLLACK, Senior District Judge, dissenting:

I respectfully dissent.

The defendants herein, insurance companies, were enjoined from seeking arbitration before the New York Stock Exchange of

their claims against SLK, the appellee. The majority lifts that injunction.

Marvin Goodman was a floor broker on the Commodity Exchange and was a member of the NYSE. He solicited individuals to trade gold and silver commodity futures contracts. He traded those customers' accounts through sub-account arrangements with SLK who handled the mechanics and cleared the transactions in those "Goodman" accounts.[1]

Some of his customers gave money to Goodman to finance their trades. To save his clients from loss from his advice and trading, Goodman purchased and himself paid for insurance on his life through the appellants, naming his clients in an insurance trust as beneficiaries of the life insurance. Goodman died and the Goodman clients collected the life insurance.

The insurance companies then filed arbitration claims with the New York Stock Exchange against SLK the clearing broker seeking a recovery from the clearing broker of the life insurance which they had paid to Goodman's customers. The insurance companies charged that Goodman was guilty of fraud on his personal customers and that SLK had furnished incomplete or doctored statements of account to those customers and had thereby assisted Goodman in his fraud on his customers. Goodman's customers are making no claim.

SLK sued to enjoin the attempted arbitration on the ground that it was not obligated to arbitrate any claims of the insurance companies and the district court entered an injunction against the attempted arbitration proceedings. The insurance companies appealed.

The NYSE arbitration rules are applicable in respect of any dispute between a member brokerage firm and any third party *"arising out of"* or *"in connection with"* the firm's *"business"*. It is undisputed that the insurance companies had no business or connection or communication whatsoever with the clearing brokers and were not furnished by SLK any statements of account applicable to Goodman's clients and did not request any information whatsoever from SLK. In short, the insurance companies did no due diligence so far as concerns SLK or in any way inform it that they were selling life insurance to Goodman for the protection of his personal customers.

To obtain the arbitration which the District Court enjoined, the Insurers claim that SLK acted wrongfully in the handling of Goodman's sub-accounts with his customers' accounts. They assert that even if SLK did not deal directly with the Insurers, and had no part in the procurement and payment by Goodman for insurance on his life for the benefit of his customers, that by mishandling of Goodman's accounts, SLK was a proximate cause of the Insurers' "losses" and that SLK thus collaborated with Goodman in "defrauding" the Insurers. The insurance companies obtained life insurance premiums from Goodman on the life insurance and paid the beneficiaries designated for those premiums.

The majority reaches its conclusion that the insurance companies are entitled to demand arbitration with SLK by the NYSE on the reasoning that the payment of the death benefits under the life insurance policies "aris[es] out of the business," NYSE Const., art XI, § 1, or "aris[es] in connection with [its] business." NYSE Arbitration R 600(a). The majority rests this result on the notion that the Insurers were or are intended third party beneficiaries of the settlement of the life insurance payments on Goodman's death to the designated beneficiaries of the life insurance that Goodman purchased.

It seems appropriate to recite what the record shows which makes clear beyond peradventure of doubt that the life insurance companies are in no way third party beneficiaries of any claim against SLK and that

---

1. SLK received commissions on every trade and would split the interest in Goodman's account on a monthly basis. SLK created approximately 69 accounts under a primary account number in Goodman's name labelled "7260 MG MOO" ("primary account"). At least three other accounts were also in Goodman's name and were labelled with names such as "Goodman Arbitrage." The remaining accounts were set up as "sub-accounts" under the 7260 account number, i.e., 7260–7283, and were listed under the hyphenated name of Goodman and a Goodman customer.

neither the sale of the insurance to Goodman nor payment of the death benefits to the trust for the named beneficiaries constituted the Insurers third party beneficiaries of any claim thereon against SLK.

The controversy at issue does not even remotely arise out of SLK's exchange-related business; it concerns insurance policies which Goodman purchased and personally paid for to benefit his customers in the event of his death, by providing for protection from delays of probate in the event of his death. The trustees of the insurance trust created by Goodman were to pay the proceeds first to the persons who had given Goodman money for him to trade (since the account was in Goodman's name, these individuals would otherwise not be paid until Goodman's estate was probated), and to hold the remainder in continuing trust for Goodman's heirs.

Plainly, the Insurers are not presenting an exchange-related dispute in which either Goodman or his customers make claim or are parties. The life insurers are not third party beneficiaries to the contract between SLK and the NYSE rule governing arbitration which provides that "any controversy . . . between a member . . . and any other person arising out of the business of such member" shall be submitted to arbitration. Neither SLK nor the NYSE could ever have intended to benefit with Exchange arbitration, unrelated life Insurers which sold estate planning and the insurance benefits to Goodman, a customer of SLK, the brokerage firm, without any participation or input whatsoever of SLK, on the notion that the Insurers had thus achieved a third party status under the arbitration agreement between the Exchange and its members.

Moreover, any attempt to place the life Insurers "in the shoes of" Goodman must fail. Equitable subrogation or the equivalent, third party beneficiary status, does not exist for life insurance. Nor are the life Insurers able to invoke a third party beneficiary status based on the mere fact that there was a tort committed against them by Goodman, because third party beneficiary doctrine is applicable to contract, not tort, law.

In describing who are intended and incidental third party beneficiaries, the Restatement (Second) of Contracts § 302 teaches that:

" . . . a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

It is undeniable that SLK did not "intend" or in fact or in law confer an arbitrable right on the Insurers of Goodman's life or intend to reimburse life insurance proceeds paid by the Insurers in accordance with the policy which it wrote. The life insurance was obtained and paid for by Goodman without the knowledge or participation of SLK, to facilitate payment of death benefits promptly without waiting on the administration of Goodman's estate; it bore no relation at all to SLK.

To summarize for the sake of any needed further clarification:

We are asked to compel a member of the NYSE to arbitrate a possible tort claim asserted by life Insurers which wrote life insurance on the life of one, Goodman, a customer of SLK, as part of his estate planning, for the benefit of Goodman's customers, payable to a trust for their benefit. The Insurers had no contact or business of any kind with SLK and made no inquiries of SLK. The Insurers wrote the life policies for, and dealt with Goodman, but never transacted any business with SLK. By virtue of joining the NYSE, SLK agreed to arbitrate only the business claims of any person who asserted a claim against SLK in connection with some business conducted by or with SLK by that person.

SLK never came in contact with the Insurers/appellants, never made any representations to the latter, never sent any documents or communications whatsoever to appellants, had no knowledge of the dealings of Goodman resulting in the life insurance and did not provide appellants with

any ground on which they could reasonably believe that appellants were obtaining or could assert an arbitrable right against SLK for the sum paid out on the life insurance written for the benefit of Goodman's customers. The Insurers never contacted SLK regarding Goodman's insurance applications, his SLK account statements or anything else. To compel SLK to arbitrate with the Goodman Insurers would violate the basic principle that a party cannot be compelled to arbitrate with one with whom there is no business connection, or any contract to do so directly or by inference. The life insurance on Goodman's life did not arise in connection with any business between the life insurance companies and SLK.

Again, there was no transaction between the member and non-members, who were strangers to one another. As the Eleventh Circuit recently held in an analogous NASD context, the fact that the non-member and member "had absolutely no relationship" to each other "at the time of the alleged events that the [non-member] seek[s] to arbitrate", affords a "compelling basis" for the conclusion that the member could not be deemed to have agreed to arbitrate with a non-member stranger. *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 818 (11th Cir.1993).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute outside the scope of the business conducted or involving the estate planning undertaken by life insurers with another he has never agreed so to submit". *United Steelworkers of America v. Warrior and Gulf Navigation Co.* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). *See also, Thomson–CSF, S.A. v. American Arbitration Assoc.,* 64 F.3d 773, 779 (2d Cir. 1995). Congress, in enacting the Federal Arbitration Act, preserved this principle. *See Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989) ("The FAA does not require parties to arbitrate when they have not agreed to do so".) While we have held that the NYSE arbitration provisions may require a party to submit to arbitration in the absence of a written agreement, *see, e.g., Paine, Webber, Jackson & Curtis v. Chase Manhattan,* 728 F.2d 577, 580 (2d Cir.1984), we have never extended this principle to require the member to submit to arbitration of claims outside the member's chain of commerce. Here it is clear that SLK did not "intend", in fact or law, to reimburse life insurance payments made by the Insurers to customers of the deceased on policies of insurance with which SLK had no connection, which were obtained by Goodman for prompt administration of his estate and bore no relationship to SLK at all. Goodman's customers are not claimants against SLK.

The majority's reliance on *Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership,* 41 F.3d 861 (2d Cir.1994) and *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) is inapposite. *Kidder, Peabody* involved direct business contact between a broker and its customer and a written contract between those parties which specifically incorporated the NASD provisions and rules into it. In *Gilmer* the Supreme Court suggested that a third party, Interstate, could compel its ex-employee to arbitrate as a third party beneficiary of the business agreement between the ex-employee and the Exchange, but the agreement relied upon, Gilmer's securities registration application, specifically designated any of Gilmer's employees as beneficiaries to the agreement. Goodman's life insurance trust did not name SLK, his employer, as a beneficiary of the insurance trust. Nor does the NYSE's investigation into Goodman's activities or the procedural shortcomings of SLK for which they were fined, establish Goodman's life insurers as third-party beneficiaries entitled to admission into Exchange arbitration for recovery of the insurance payment to the intended and named legatees.

Finally the Insurers' payment on Goodman's policy does not entitle them to the arbitrable right formerly held by Goodman himself. There is no right of equitable subrogation under life-insurance. (16 Couch, *Cyclopedia of Insurance* § 61:8 2d rev. ed.1983).

The record (A–197–98) contains an application on behalf of Goodman (unknown to SLK) to one of the insurers, explaining Goodman's motivation for purchasing life insurance, as follows:

> For trading purposes, all accounts are in Marvin Goodman's name. As you know, Marvel wishes to have all account balances (all of which are traded under his name) liquid when he dies and not held up in probate which may take two years during which his clients will not have their money. Life insurance in some multiple amount of his capital base is very important to Marv for business as well as psychological reasons. He cannot take in new money without the assurance of ample protection since the account growth tends to diminish insurance rather quickly. As a result he always wants to be insured ahead of his anticipated needs (approximately 2x account balances).

> Once Marv's account balance meets his insurance total, he must stop growing which is counter productive. Marv's fee is based only on profits. We would like Mass Mutual Life to issue an additional $10 million of insurance. The insurance would be owned by an irrevocable Trust to immediately liquidate all the client balances. The fact that this trust discharges an obligation (debt) of the estate creates a secondary need for funding the estate tax (1st death) that is attributed

to the estate relative to the debt paid (see enclosure). This, of course, reduces the ultimate amount available to his family after probate.

The District Court Judge soundly observed that:

> "It is undisputed that Plaintiff [SLK] never had any direct contact or business transaction with Defendants [Insurers]." Goodman obtained the life insurance policies independently of Plaintiff and without Plaintiff's knowledge. Defendants do not claim there was any contractual relationship with Plaintiff. In fact, Defendants do not allege any contact with Plaintiff at all. Rather, Defendants claim that their reliance on falsified documents, whether by the fraudulent conduct of Goodman or that of Plaintiff, makes Plaintiff accountable to Defendants . . . . (A–927–28) '[A]ny rule extending the arbitration provisions to controversies not arising out of exchange-related business would do significant injustice to the reasonable expectations of exchange members . . .' *Paine, Webber,* 728 F.2d at 581. (A–927).

I would affirm.[2]

---

2. The NYSE has refused to act as arbitrators in controversies remote from the business purposes and scope of arbitrable "exchange related" business controversies. *Cf. In re Salomon, Inc.,* 68 F.3d 554 (2d Cir.1995)

Essential fairness to both parties is better served by leaving the administration of the unusual issues herein to judicial standards in the Courts rather than by straining to bring life insurance for estate planning within the scope of "exchange related" business for third parties to exchange agreements.

No matter how the semantics are arranged, the instant claims to recover life insurance payments made to Goodman's customers at his death do not and cannot represent claims arising in connection with the business of Goodman's stockbrokers. The semantic allusions in the majority opinion to the "errors" in the minority opinion did not originate with the minority opinion, but a response would only further delay focussing on the merits of the life insurers' unsupportable third party concoction to gain an unmerited arbi-

tration (even if it is safe for the majority to assume that the Stock Exchange would consider the convoluted claim for arbitration).

The notion of "arising out of exchange-related business" must be limited in some manner, lest *any* third party could compel an exchange member to arbitrate any claim, so long as some tenuous link to the member's "business" be alleged. This limitation should take the form of either a direct contract between the parties, or a relationship between the parties, such that they stand in the "chain of commerce," one with the other— situations which were present in all prior decisions invoking the third party beneficiary rule. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership,* 41 F.3d 861 (2d Cir.1994); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The claims at issue here simply fail such a test. A tort claim based on reliance on an accounting statement not forwarded by the accountant to the injured party, will not state a claim at law. While this analysis goes to the merits of the insurers' under-

lying claim and not the question of arbitrability, a line must be drawn whereby claims that have such an invisible foundation in law will not be allowed to force an exchange member to arbitrate with a party with whom it had no contact or business.