OPINION OF THE COURT
Shirley Werner Kornreich, J.
Petitioner brings this proceeding, pursuant to CPLR 7503, to stay an arbitration claim brought before the National Association of Securities Dealers (NASD). The claim arises out of a private placement transaction for the purchase of securities offered and sold to respondents by nonparties Strategy Real Estate Investments, Ltd. (SREI) and Strategy International Insurance Group, Inc. (SIIG) (collectively Strategy). Respondents oppose this petition.
I. Background
Petitioner McMahan Securities Co., L.R is a securities broker-dealer and Financial Industry Regulatory Authority (FINRA or NASD) member.[1] Respondents are hedge funds and institutional investors. Nonparty SIIG is a publically traded holding company for several financial service companies. Nonparty SREI is a wholly-owned subsidiary of SIIG formed for the purpose of making investments in residential real estate developments in Canada.
The chronology and character of the transactions are not in dispute. On or about September 23, 2004 McMahan entered into an agreement with SREI to serve as its placement agent[2] (the Strategy contract) in SREI’s offering to sell $50 million worth of preferred stock units to qualified institutional investors (the offering). Each unit was composed of: one share of SREI Series A insured redeemable preferred stock; one share of SREI Series B preferred stock; and a warrant to purchase shares of SIIG common stock. Each unit was valued at $10,000. The Series A shares were to pay a quarterly dividend of 10% per annum until a mandatory redemption of the shares in November *388 2007. In the event two consecutive dividend payments were missed, Strategy would be liable for all accrued and unpaid dividends plus an amount equal to the entire liquidation preference for the Series A shares, which amounted to the total purchase price paid for the units. This liquidation preference and quarterly dividends were guaranteed and insured by United Insurance Company.
The Strategy contract called for Strategy to compensate Mc-Mahan as follows: an up-front engagement fee of $50,000; 5% of the total proceeds from units sold in the offering; a five-year warrant to purchase Strategy common stock equivalent to 5% of the total principal arising from all units sold in the offering; and reimbursement of up to $25,000 in expenses. The Strategy contract described in great detail the rights and obligations of the parties. It specifically noted that “McMahan shall act as an independent contractor pursuant to this Agreement [and] . . . This Agreement, including all exhibits, constitutes the entire agreement among the parties with respect to the subject matter hereof.”
In their NASD Dispute Resolution Statement of Claim, respondents allege the following. In or about November 2004 respondents purchased $50 million worth of Strategy units from SREI. Prior to this purchase, McMahan, acting as Strategy’s placement agent, presented a Confidential Private Placement Memorandum (PPM) and power point presentation (the presentation) to respondents outlining the details of the offering. During the PPM and presentation, McMahan stated that the sought-after $50 million would be invested, via short-term mortgages, in Canadian residential real estate being developed by Lux Group, Inc., a company under common control with SREI. Three individuals, John Hamilton, Sandro Sordi and Kevin Hamilton, were described as the management team in charge of investing the funds. Background information regarding their previous financial and business experience was provided. However, McMahan failed to disclose that all three men had either prior criminal convictions or other legal problems throughout their careers.
Specifically, in 1995, Sordi and John Hamilton were involved in writing false and postdated checks to their employees arising out of a failed donut shop. Also in 1995, Sordi pleaded guilty in a Canadian court to criminal charges associated from willfully furnishing false information and misappropriating government funds. In 2002, Sordi was found guilty in Broward County, Flor *389 ida, of fraud and theft arising from two separate actions. John Hamilton was involved in the transactions surrounding each suit but was not found liable for any wrongdoing. Kevin Hamilton pleaded guilty in 2001 to Canadian charges of falsifying tax returns and was ordered to pay $5 million (Canadian) in back taxes and fines. In addition, Kevin Hamilton twice filed for bankruptcy, in 1996 and 2003.
As part of the PPM, McMahan also showed each investor a copy of the subscription agreement they would be required to enter into with Strategy in order to effectuate the transaction. The subscription agreement referred to, inter alia, Strategy’s financial condition and verified the accuracy of its Securities and Exchange Commission (SEC) filings. According to the terms of the subscription agreement, all of Strategy’s SEC reports were in full compliance with the Securities Act of 1933, and contained no untrue statements or omissions of any material facts. The subscription agreement further stated that Strategy’s financial reports were prepared in accordance with generally accepted accounting principals (GAAP) and accurately depicted the financial condition of Strategy and all its subsidiaries. In addition, Strategy warranted that no major occurrences or developments had transpired since its last audit which materially affected the company’s financial state. At the time the subscription agreement was executed, Strategy represented that it had assets of mortgage notes receivable totaling $104,231,610, which were secured by mortgages on Canadian real estate. The subscription agreement also called for SIIG to register the securities that were to be held as convertible by the warrants, or be liable for liquidated damages.
The subscription agreement contained the following clauses:
“13. Binding Effect; Beneficiaries. This Subscription Agreement and the representations and warranties contained herein shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, assigns, executors, administrators and other successors, and no other persons or entities.
“14. Governing law; Submission to Jurisdiction; Waiver of Trial by Jury. . . .
“(b) Any controversy, claim or dispute arising out of or relating to this Subscription Agreement between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be litigated solely in *390 state or federal court in New York City.
“15. Remedies. The parties hereto agree that in the event of any dispute between the parties hereto arising out of, relating to or in connection with the Company or this Subscription Agreement or the Subscriber’s investment in the Company, such dispute shall be resolved exclusively by arbitration to be conducted in New York, New York, in accordance with the rules of the American Arbitration Association.” (Emphasis added.)
Each respondent executed a subscription agreement with Strategy on or about November 16, 2004. McMahan was not a signatory or party to any subscription agreement.
On or about September 16, 2005 Strategy filed a Form 10-KSB with the SEC for its annual fiscal period ending April 30, 2005 (the April report). The April report disclosed that on or about August 12, 2005 Strategy discovered the mortgages underlying its notes receivable had been discharged in October 2004 by the beneficial owners of the Series A and B preferred shares, as well as other corporate entities they controlled. As a result, since the mortgages had been discharged, the underlying notes were unsecured. Therefore, according to GAAR the notes should have been recorded as contra-equity, rather than assets, on Strategy’s financial statements. Strategy noted this change in the April report. Since the mortgages were discharged in October 2004, prior to the date of the offering and respondents’ purchase of the units, the investors allege that representations made by McMahan in the PPM and presentation regarding Strategy’s financial status were false and misleading.
On February 7, 2006 respondents filed an action against Strategy, Sordi, John Hamilton, and others, in United States District Court for the Southern District of New York, alleging breach of contract, fraud, violation of SEC rule 10b-5 and the Blue Sky laws of Minnesota, California and Texas. Around this time, SREI also provided respondents with two letters from RBC Dominican Securities Inc. These letters stated that approximately $32 million of respondents’ investment was being held in an SREI account at RBC. In or about July 2006 respondents moved to have these accounts frozen. During oral argument on this motion, SREI stated that the funds were no longer being held at RBC. Respondents never discovered where the funds were moved. The federal action settled in or around May 2007.
Respondents filed their NASD Statement of Claim against petitioner in July 2007, alleging fraud, negligent misrepresenta *391 tion, negligence and violation of the Blue Sky laws of California, Connecticut and Minnesota. Since no written agreement to arbitrate exists between the parties, respondents sought arbitration under the NASD Code of Arbitration Procedure rule 12200, which would compel McMahan to arbitrate, as a result of its NASD membership, upon the request of a customer. McMahan subsequently filed the instant petition seeking to stay the NASD arbitration arguing, inter alia, that respondents were not its customers in relation to the offering.
II. Conclusions of Law
The Federal Arbitration Act (FAA) provides that an arbitration provision in “a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” (Matter of Diamond Waterproofing Sys., Inc. v 55 Liberty Owners Corp., 4 NY3d 247, 252 [2005], quoting 9 USC § 2.) “Involving commerce” is the functioned equivalent of the phrase “affecting commerce” signaling congressional intent to exercise its full Commerce Clause powers. (Id., citing Allied-Bruce Terminix Cos. v Dobson, 513 US 265, 273-274 [1995].) As a result, where an arbitration provision “affects” interstate commerce, disputes arising therefrom are subject to the FAA. (Id.)
Petitioner, a Delaware corporation with its principal place of business in Greenwich, Connecticut, acted as Strategy’s placement agent during the offering. SIIG, a Texas corporation with its principal place of business in Ontario, Canada, sold units of preferred stock to respondents, international and domestic business entities located in California, Connecticut and Minnesota. Therefore, the transactions here clearly affect interstate commerce, and are thus subject to the FAA.
“Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.” (John Hancock Life Ins. Co. v Wilson, 254 F3d 48, 58 [2d Cir 2001] [internal quotation marks omitted], quoting AT&T Technologies, Inc. v Communications Workers, 475 US 643, 648 [1986].) In deciding questions of arbitrability, the court must determine whether an agreement to arbitrate exists and if the dispute falls within the scope of such agreement. (Spear, Leeds & Kellogg v Central Life Assur. Co., 85 F3d 21, 25 [2d Cir 1996].)
A. Valid Agreement to Arbitrate
The NASD compels its members to arbitrate disputes with investors even where no direct transactional relationship or *392 written agreement incorporating the NASD Code of Arbitration Procedure exists. (Vestax Sec. Corp. v McWood, 280 F3d 1078, 1081 [6th Cir 2002] [“The NASD Code of Arbitration Procedure . . . creates the right of parties to compel an NASD-member firm to arbitrate even in the absence of a direct transactional relationship with the firm”]; Multi-Financial Sec. Corp. v King, 386 F3d 1364, 1367 [11th Cir 2004] [“the Code serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants”].) Even where two parties have not entered into a direct agreement to arbitrate, NASD rules 10101 and 10301 (a) (now codified as rule 12200) can bind a NASD member to arbitrate certain third-party claims. (O.N. Equity Sales Co. v Staudt, 2008 WL 271329, *3, 2008 US Dist LEXIS 7777, *8 [D Vt 2008].)
Although the arbitration provision is governed by the FAA, the court must interpret the NASD Code according to New York contract principles to determine if the parties agreed to arbitrate. (King, 386 F3d at 1367; Chelsea Sq. Textiles, Inc. v Bombay Dyeing & Mfg. Co., Ltd., 189 F3d 289, 296 [2d Cir 1999] [“in determining whether the parties agreed to arbitrate . . . (we) properly look() to general state law contract principles for guidance”].) As in any other contract, the court must give full effect to the parties’ intent expressed by the ordinary language of the provision. (John Hancock, 254 F3d at 58, citing PaineWebber Inc. v Bybyk, 81 F3d 1193, 1199 [2d Cir 1996]; American Express Bank v Uniroyal, Inc., 164 AD2d 275, 277 [1st Dept 1990].) However, unlike other contracts, “any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.” (John Hancock, 254 F3d at 58, quoting Moses H. Cone Memorial Hospital v Mercury Constr. Corp., 460 US 1, 24-25 [1983].)
McMahan does not contest that its NASD membership creates an agreement to arbitrate all disputes contemplated under rule 12200. Therefore, the first prong of the analysis has been satisfied, and the court will assess whether the relationship between McMahan and the respondents falls within the scope of NASD rules.
B, NASD Code of Arbitration Procedure Rule 12200
NASD Code of Arbitration Procedure rule 12200 provides:
“Parties must arbitrate a dispute under the Code if:
“Arbitration under the Code is either:
“(1) Required by a written agreement, or
*393 “(2) Requested by the customer;
“The dispute is between a customer and a member or associated person of a member; and “The dispute arises in connection with the business activities of the member or associated person, except disputes involving the insurance business activities of a member that is also an insurance company.”
To compel a NASD member to arbitrate under this provision, courts require that an investor’s claim: involve a dispute between a member and a customer or an associated person of the member and a customer; and arise in connection with the business activities of the member or in connection with the business activities of the associated person. (John Hancock, 254 F3d at 58; King, 386 F3d at 1367; Vestax, 280 F3d at 1081.)
1. Respondents are McMahan’s Customers Pursuant to Rule 12200
McMahan argues that none of the respondents were its customers in relation to the offering. According to McMahan, the court should use the definition of customer embodied in NASD Rules of Conduct rule 2270, entitled “Disclosure of Financial Condition to Customers.” Rule 2270 (b) defines customer as “any person who, in the regular course of such member’s business, has cash or securities in the possession of such member.” Consequently, McMahan argues respondents were never its customers since they never delivered any cash or securities to it during the offering.
NASD’s definition of customer, however, is broad, excluding only a broker-dealer, and clearly includes customers of any person associated with the member. (Financial Network Inv. Corp. v Becker, 305 AD2d 187, 188 [1st Dept 2003], citing John Hancock, 254 F3d at 59.) “[W]hen the investor [customer] deals with an agent or representative [of a member], the investor deals with the member, and on that basis the investor is entitled to have resolved in arbitration any dispute that arises out of that relationship.” (Becker, 305 AD2d at 188, quoting Vestax, 280 F3d at 1082.)
The argument proffered by McMahan, which attempts to narrow the definition of customer, has previously been rejected. For example, in Multi-Financial Sec. Corp. v King (386 F3d 1364 [2004]), NASD member IFG Network Securities, Inc. argued that since no direct transactional relationship existed between it and King, an investor, King was not its customer. The court rejected IFG’s argument, citing to Becker:
*394 “Enforcing the limitation IFG seeks would be tantamount to reading language into the Code that is conspicuously absent. Other inapplicable NASD rules [such as rule. 2270 regarding the disclosure of financial condition to customers and rule 2520 regarding margin requirements] do make a distinction between customers generally and customers of the member. . . .
“Rules 2270(b) and 2520(a)(3) show that the NASD could limit the term ‘customer’ specifically to those with whom the member has a direct relationship. Its clear and unambiguous choice to leave the term as defined generally immediately leads to the conclusion that King satisfies the ‘customer’ requirement because she is not a broker or a dealer, even though she may not have been a direct customer of IFG.” (King, 386 F3d at 1368.)
The broad definition of customer articulated in John Hancock (254 F3d at 59), and adopted by the First Department in Becker (305 AD2d at 188), represents the majority view. As noted in John Hancock:
“There is nothing in the language of Rule 10301, or any other provision of the NASD Code, that compels us (or even suggests that we ought) to adopt John Hancock’s narrow definition of the term ‘customer.’
In fact, the NASD Code defines ‘customer’ broadly, excluding only ‘a broker or dealer.’ Rule 0120(g). The Investors are neither.” (254 F3d at 59; accord Washington Sq. Sec., Inc. v Aune, 253 F Supp 2d 839, 841 n 1 [WD NC 2003] [“The majority view (on Rule 10301) is stated in the John Hancock opinion”]; Daugherty v Washington Sq. Sec., Inc., 271 F Supp 2d 681, 690 [WD Pa 2003] [“The majority of federal courts faced with interpreting NASD Rule 10301(a) concluded NASD members must arbitrate disputes raised by customers of their associated persons”]; Vestax, 280 F3d at 1082 [adopting John Hancock’s view rejecting argument that rule 10301 required defendant-investors to be direct customers of NASD member firm in order to compel arbitration against member]; Washington Sq. Sec., Inc. v. Sowers, 218 F Supp 2d 1108, 1116 [D Minn 2002] [“Federal case law plainly states that when the investor deals with an agent or representative (of a NASD member), the investor deals with the member, and on that *395 basis the investor is entitled to have resolved in arbitration any dispute that arises out of that relationship”].)
Here, respondents dealt with McMahan, Strategy’s placement agent, during the offering. Respondents are not broker-dealers. Institutional investors, who enter into subscription agreements with third-party representatives of a NASD member, qualify as the member firm’s customers in a private placement transaction compelling arbitration pursuant to Rule 12200. (O.N. Equity Sales Co. v Staudt, 2008 WL 271329, 2008 US Dist LEXIS 7777 [2008]; O.N. Equity Sales Co. v Hoegler, 2008 WL 304924, 2008 US Dist LEXIS 5852 [D NJ, Jan. 28, 2008]; O.N. Equity Sales Co. v Thiers, 2008 WL 110603, 2008 US Dist LEXIS 3765 [D Ariz, Jan. 10, 2008]; O.N. Equity Sales Co. v Pals, 509 F Supp 2d 761 [ND Iowa 2007]; O.N. Equity Sales Co. v Venrick, 508 F Supp 2d 872 [WD Wash 2007]; O.N. Equity Sales Co. v Steinke, 504 F Supp 2d 913 [CD Cal 2007]; O.N. Equity Sales Co. v Wallace, 2007 WL 4106476, 2007 US Dist LEXIS 84945 [SD Cal, Nov. 15, 2007]; O.N. Equity Sales Co. u Rahner, 526 F Supp 2d 1195 [D Colo 2007]; O.N. Equity Sales Co. v Gibson, 514 F Supp 2d 857 [SD W Va 2007]; O.N. Equity Sales Co. v Samuels, 2007 WL 4237013, 2007 US Dist LEXIS 90332 [MD Fla, Nov. 30, 2007].) Respondents, thus, were McMahan’s customers pursuant to NASD rule 12200.
2. The Dispute Arises in Connection with McMahan’s Business Activities
The NASD requires that its members supervise the activities of their associated persons. (Staudt, 2008 WL 271329, *5, 2008 US Dist LEXIS 7777, *13, citing King, 386 F3d at 1370; John Hancock, 254 F3d at 58-59.) Therefore, any dispute arising from a firm’s lack of supervision over its brokers arises in connection with its business activities. (Id.; Vestax, 280 F3d at 1082.) Here, the essence of respondents’ negligence claim is that McMahan failed to supervise the activities of its own representatives in connection with the fraud and misrepresentations they perpetrated on the investors before, during, and after the offering. Consequently, the court finds that rule 12200’s second condition is satisfied and petitioner is bound to arbitrate pursuant to the NASD rules. (Id.; see also Becker, 305 AD2d at 189 [“It suffices that there was a business relationship with the representative that related directly to investment services”].)
C. Forum Selection Clause
Finally, petitioner argues that even though it is not a party to the subscription agreement, it can invoke the forum selection *396 clause contained in paragraph 14 and, thereby, avoid arbitration. The court believes that petitioner must submit to arbitration pursuant to the NASD rules. Nonetheless, it will address this argument.
McMahan contends that it is closely related to Strategy since it acted as Strategy’s placement agent and, therefore, it may invoke the agreement’s forum selection clause. (See Freeford Ltd. v Pendelton, 53 AD3d 32 [1st Dept 2008] [nonsignatory may invoke contract’s forum selection clause when nonsignatory is third-party beneficiary, nonsignatory is party to global transaction or nonsignatory is closely related to party to contract and its enforcement of clause is foreseeable].) This argument, however, ignores paragraph 13 of the contract, which explicitly excludes all but the signatories and their successors from the contract’s provisions. The clear and unambiguous language of the contract, thus, excludes McMahan from paragraph 14. (See Lopez v Fernandito’s Antique, 305 AD2d 218, 219 [1st Dept 2003] [contracts must be interpreted according to their plain meaning].) Accordingly, it is ordered that the petition to stay arbitration is denied and the proceeding is dismissed.

. FINRA was formed on or about July 30, 2007 taking over the regulatory functions of the NASD and New York Stock Exchange. FINRA has incorporated NASD’s rules and regulations.

. The court takes judicial notice of the commonly known industry fact that a placement agent is a registered broker-dealer who is hired by an issuer of securities to find institutional investors willing to invest in the securities being offered by the issuer.