**INTERNATIONAL KLAFTER COMPANY, INC., International Assurance, Inc., and International Group Underwriters, Inc., Plaintiffs–Appellants,**

v.

**CONTINENTAL CASUALTY COMPANY, INC., Defendant–Appellee.**

No. 452, Docket 88–7698.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1988.
Decided Feb. 21, 1989.

Joseph H. Einstein, (Goodkind, Wechsler, Labaton & Rudoff, New York City, of counsel), for plaintiffs-appellants.

Stuart I. Parker, (Siff, Rosen & Parker, P.C., Kathleen E. Schaaf, Robert F. Walsh, New York City, of counsel), for defendant-appellee.

Before LUMBARD, WINTER and MAHONEY, Circuit Judges.

LUMBARD, Circuit Judge.

International Klafter Co., Inc., International Assurance, Inc. and International Group Underwriters, Inc. appeal from an order of the District Court for the Southern District of New York, Stanton, *Judge,* granting summary judgment in favor of defendant Continental Casualty Corporation (CCC) in a breach of contract action they brought under diversity jurisdiction. The three plaintiff corporations ("agents") served as general insurance agents for CCC until January 1984, when CCC terminated its agreements with them without giving any reason. The sole question before us is whether the district court properly interpreted the termination provisions in the agents' contracts to permit termination of these contracts at will, without any showing of cause. We agree with the district court that the plain language of the agreement permitted termination at will, and it was not error for the district court to exclude evidence extrinsic to the plainly-worded instrument between the parties.

The stipulated facts are as follows: CCC is an insurance company which writes policies and sells them through selected agents in various geographical territories. These "general agents" sell and service insurance policies in their respective territories under contracts, called "general agency agreements", between CCC and each agent. The agents were general agents for CCC under such contracts. International Underwriters, Inc., a division of International Klafter Co., Inc. (hereinafter "New York", following the geographic appellation employed by the parties), had a contract with CCC dated May 5, 1967 (the New York Agreement) under which International Underwriters acted as CCC's general agent in New York. International Group Underwriters, Inc. (Florida) had a similar general agency agreement with CCC, dated June 20, 1974, under which it acted as CCC's general agent in Florida. Florida had also purchased the right to conduct the business of CCC's former Florida Centralized Sales Office, under an agreement dated July 1, 1977 (the Florida Purchase Agreement), which agreement expressly incorporates the termination provisions of the Florida Agreement.

The New York and Florida Agreements have common termination provisions in Paragraph 8, which provides that the respective agreement "shall continue in force until either party ... shall give the other party thirty (30) days prior written notice of intention to terminate it for any cause other than as specified in Paragraph 18 [excerpted below] (in which case the provisions of paragraph 18 shall apply)." Paragraph 8 goes on to specify certain payments and commissions which CCC must pay the terminated general agent in the months following termination under Paragraph 8.

Paragraph 18 of the New York and Florida Agreements provides: "It is agreed

that this contract, in the event of fraud or breach of any of its conditions or provisions on the part of the [a]gent or his inability to secure or retain the necessary license from governmental authorities, may be cancelled by [CCC] upon immediate notice and in such event, the [a]gent shall not be nor thereafter become entitled to any further commissions or credits of any kind hereunder. . . . "

On December 20, 1983, CCC notified New York and Florida that it would terminate the New York, Florida and Florida Purchase Agreements as of January 31, 1984. CCC, pursuant to Paragraph 8 of the New York and Florida Agreements, paid Florida and New York together a total of over $400,000 in the forty months subsequent to the termination date. The parties do not dispute that these payments were fully and timely made. At no time has CCC given any reason for the terminations.

Leonard Klafter, who is the principal of the agents, places great weight on his course of dealing with CCC. He was a salaried employee of CCC from 1955 until mid–1967, when he left CCC and became a general agent for CCC and its sister company Continental Assurance Co., Inc. While on CCC's payroll, Klafter rose to the position of regional manager, with responsibility for selecting and coordinating the general agents in twelve states.

Upon Klafter's departure from CCC in 1967, CCC selected Klafter to be a general agent and expanded the territory and volume of his agency during the period between 1967 and December 20, 1983, when the notice of termination was delivered.

Klafter testified that CCC had an unwritten policy whereunder general agents were not terminated as long as they performed satisfactorily and lawfully. Klafter asserted, and CCC does not deny, that he advised prospective general agents of this policy while he was in CCC's employ. When he became a general agent for CCC, Klafter avers, he assumed that this policy remained

in effect. In each case, however, the same or a substantially similar written instrument was used to document the general agency agreements, none of which contains any mention of this policy of termination only for good cause.

Plaintiffs New York and Florida (and several other general agents) filed suit against CCC, its sister company and an affiliate in April 1986. The second amended complaint, filed on December 18, 1986, alleged breach of contract, tortious interference with contractual relations and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* In November 1986, the district court granted CCC's motion to dismiss the tortious interference claim, with leave to replead. On December 18, 1986, the agents served a second amended complaint; extensive discovery followed, chiefly on the tortious interference and RICO claims. Then, in December 1987, the parties entered into a stipulation to facilitate the resolution of the contract construction issue now before us. The agents dismissed their charges against all defendants other than CCC and dropped the tortious interference and RICO causes of action, leaving only the breach of contract claim. In addition, several affiliates of the present plaintiffs in the initial complaint withdrew, leaving only New York, Florida and one other general agent.[1] The three remaining plaintiffs then filed a Third Amended Complaint alleging only that CCC breached the New York Agreement and one other agreement[2] by terminating them "without cause" and that CCC terminated the Florida Agreement and the Florida Purchase Agreement by terminating them "without good cause." Since the facts are stipulated, the parties promptly cross-moved for summary judgment.

By memorandum opinion dated June 14, 1988, Judge Stanton granted CCC's summary judgment motion. He wrote that Paragraph 8 of the agreements must be

---

1. International Assurance, Inc., also party to a general agency agreement which CCC terminated, withdrew from this appeal prior to argument.

2. *See* note 1 *supra.*

read with Paragraph 18 in mind, and, when that is done, the only reasonable construction of Paragraph 8 that emerges from these contracts is that either party may terminate "at will". Since the meaning of the contracts is plain, the court held, there is no reason to look outside the documents for extrinsic evidence of the parties' intent. We agree.

■ The agents argue that the district court erroneously "read[ ] into" the contract a provision permitting at will termination. They believe that the words "any cause" in Paragraph 8 cannot be interpreted to permit termination for "no cause", and contend that the district court's interpretation represents a judicial modification of the contract. This view does not, however, give effect to the plain meaning of the words. Moreover, because paragraph 18 enumerates the several agreed-upon good causes for termination, the reading of "good cause" into Paragraph 8 would place the two provisions, which have different notice and payment obligations, into opposition.

Under New York law, which governs here, the court is required to discern the intent of the parties to the extent their intent is evidenced by their written agreement. *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 1100, 488 N.Y.S.2d 645, 646 (1985). Where the parties' intent is "clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." *Id.* (citations omitted). Here, the words "any cause" do not admit of any interpretation other than the meaning of the words themselves: termination is permitted for any reason at all. The word "cause" does not have any intrinsic component of good faith or even rationality; the words "for any cause" are not the opposite of "without cause". Rather, "any cause" means at will termination, even at the whim of the terminating party. The party terminating is not required to give any reason.

Consideration of the provisions of the contract as a whole supports this interpretation of Paragraph 8. Since the court must look to "all corners of the document" rather than view sentences or clauses in isolation, *Tougher Heating & Plumbing Co., Inc. v. New York*, 73 A.D.2d 732, 733, 423 N.Y.S.2d 289, 290–291 (3d Dept.1979), it would be illogical to read a "good cause" requirement into Paragraph 8 and thus eviscerate Paragraph 18. Paragraph 8 provides for 30 days' notice and substantial termination payments in the event that CCC terminates for any cause other than the three listed in Paragraph 18, while Paragraph 18 lists those causes—breach, fraud and lack of license—and CCC is not obliged to give notice or to make payments if it terminates for one of these three reasons.

The agents aver that Paragraph 8 is meant to encompass only certain "valid reasons" for termination which "do[ ] not rise to the level of fraud or breach of contract" covered in Paragraph 18. However, given the breadth of Paragraph 18's listed causes and the absence of any elucidation in the contract of what the "valid reasons" might be, the court is constrained by the literal meaning of the words to construe "any cause" to mean "any reason". The facts that the parties chose to enumerate what they considered to be good reasons for termination in the more Draconian Paragraph 18 and to require notice and termination penalties for all other causes does not support the conclusion that they intended tacitly to impute into Paragraph 8 some unspecified "good cause" requirement. The terms "breach" and "fraud" are quite expansive and cover the range of legally "good" reasons for termination; in order to have given effect to the agents' reading of Paragraph 8, the court would have had to have ignored the words "any cause" and instead endeavored to determine whether the decision to terminate for a subjective reason such as dissatisfaction was made arbitrarily or for a "valid" reason. Such an endeavor would be inappropriate, however, since the terms of the contract cover all terminations and require CCC to state a reason for termination only if it were terminating under Paragraph 18.

In *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir.1985), we ap-

plied New York law to an employment contract which provided for termination for any of several enumerated reasons "or any other reason". We found that this language was ambiguous, since to give the "catch-all" phrase its clear meaning would be to render the enumeration of reasons purposeless. "If the parties had intended that the [a]greement be terminable at will," we concluded, they could have let the language "for any reason" stand alone and omitted the enumeration of reasons. *Id.* at 1020. In the contract at bar, the parties followed this exact course, enumerating several reasons for immediate termination in Paragraph 18 and providing in Paragraph 8 for termination for any other cause.[3] The at will language employed here thus must prevail.

■ In view of the unambiguous language of the agreements, it was not error for the district court to exclude parol evidence from its consideration. It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible. *See, e.g., City of Oglesby v. Federal Energy Regulatory Commission,* 610 F.2d 897, 905 (D.C.Cir.1979). Consequently, any conceptions or understandings any of the parties may have had during the duration of the contracts is immaterial and inadmissible. Since the language of the contracts is unambiguous, there is "no need here to examine the conduct of the parties over the intervening years to ascertain their intent." *Slatt, supra,* 64 N.Y.2d at 967, 477 N.E.2d at 1100, 488 N.Y.S.2d at 646.

AFFIRMED.

---

3. Although the contracts under consideration are not employment contracts, to which stricter formulae for interpreting the word "cause" apply in New York, this canon of construction is equally applicable here.