**Docket Nos. 00–9525, 00–9505.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 20, 2001.

Decided June 18, 2001.

**JOHN HANCOCK LIFE INSURANCE COMPANY, Signator Investors, Inc., Plaintiffs–Appellants–Cross–Appellees,**

v.

**Joseph A. WILSON, Defendant-Counter-Claimant-Appellee-Cross-Appellant,**

Susan Alecca, Michael J. Alecca, Warren Neals, Eileen M. Attello, Joseph Attello, Eunice Byczek, Joseph Byczek, Margaret Noll, Antoinette McNerlin, James McNerlin, Angeline Simpson, Frank Simpson, Laura Brown, Consolidated-Defendants-Counter-Claimants-Appellees-Cross-Appellants.

Daniel Hurteau, Albany, N.Y. (Carolyn G. Nussbaum, Nixon Peabody, Albany, NY, Katherine C. Lake, Fowler, White, Gillen, Boggs, Villareal and Banker, Tampa, FL, of counsel), for Appellants.

Kalju Nekvasil, Clearwater, FL (Goodman & Nekvasil, Clearwater, FL, of counsel), for Appellees.

Before MESKILL, PARKER and KATZMANN, Circuit Judges.

Judge KATZMANN concurs in a separate opinion.

MESKILL, Circuit Judge:

Plaintiffs John Hancock Life Insurance Co. and Signator Investors, Inc. (collectively, "John Hancock") appeal an order and judgment of the United States District Court for the Northern District of New York, McAvoy, *J.*, granting defendants' motion to compel arbitration, denying defendants' motion to stay the action pending arbitration and dismissing the complaint and counterclaims in their entirety. Defendant Joseph A. Wilson and the defendants in ten consolidated actions (collectively, the "Investors") appeal the same order and judgment.

The parties present three issues on appeal: (1) whether the district court erred in determining whether the Investors' claims were arbitrable or whether that determination should have been made in the first instance by the arbitrators; (2) whether the district court erred in finding that the Investors' claims fell within the scope of the arbitration provisions of the National Association of Securities Dealers, Inc. (NASD); and (3) whether, after holding that the Investors' claims were subject to arbitration, the district court erred in dismissing, rather than staying, the action pending arbitration.

For the reasons that follow, we affirm the district court's judgment in its entirety.

## BACKGROUND

The Investors' underlying claims arise out of their purchase of fraudulent promissory notes from Frank P. Fucilo (Fucilo) and Fucilo's associate, Michael A. Palladino, Sr. (Palladino). The Investors seek to hold John Hancock liable for Fucilo's and Palladino's wrongful actions.

### A. *Relationships Between the Parties*

The relevant facts regarding the relationships between John Hancock, Fucilo

and the Investors are not complex and are largely undisputed.

Fucilo, an independent insurance agent and investment broker, maintained an office at his home in Kingston, New York. John Hancock is a member of the NASD. In April 1997, Fucilo and John Hancock entered into a Sales Representative Agreement, which authorized Fucilo to sell certain life insurance and annuities on behalf of John Hancock. As a result, Fucilo is an "associated person" under NASD regulations. *See* NASD By–Laws, Art. I(ee) (defining an "associated person of a member," in pertinent part, as "a sole proprietor, partner, officer, director, or branch manager of a member; or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member").

Beginning in or about early 1998, Fucilo sold fraudulent promissory notes to the Investors. The Investors are customers of Fucilo. They are not customers of John Hancock. There is no evidence that Fucilo represented to the Investors that he was affiliated with John Hancock, or that the Investors knew that Fucilo was affiliated with John Hancock. Fucilo had no authority from John Hancock to sell the fraudulent investment products, nor did John Hancock have any knowledge that Fucilo was selling these products.

The only possible connection between John Hancock and the Investors was through their independent relationships with Fucilo. To summarize in the district court's words, "there is an abundance of unrefuted evidence demonstrating that [John Hancock was] in no way involved with the instant transactions; that defendants may not have known Fucilo to be a representative of [John Hancock]; and that defendants may not have been [John Hancock's] customers."

### B. *Arbitration Proceedings*

In late 1999 and early 2000, the Investors filed four substantially similar Statements of Claim [1] against John Hancock under the auspices of the NASD in Florida. Fucilo and Palladino were not named as parties to any of the arbitrations. The Investors invoked the jurisdiction of the NASD Arbitration Tribunal on the basis of John Hancock's membership in the NASD, the NASD Code of Arbitration Procedure (the "NASD Code") and the Form U–4s of Fucilo and Palladino.[2] They assert claims against John Hancock for violations of federal securities laws, breach of contract, common law fraud, breach of fiduciary duty, negligence and gross negligence, and seek, *inter alia*, actual damages and rescission.

We need not recount the details of the Investors' arbitration claims, which range from 97 to 108 pages each, to resolve this appeal. It suffices to say that the Investors allege that John Hancock breached various duties that it owed to the Investors with respect to the actions of John Hancock's registered representatives. As a result, the Investors seek to hold John Hancock liable under a number of alternative theories, *e.g.*, failure to supervise and respondeat superior, for the losses they

---

1. The claimants in these four actions are Joseph A. Wilson, et al. (Case No. 00–00187), Frank H. Simpson, et al. (Case No. 99–05342), Warren F. Neals, et al. (Case No. 00–00213) and Joseph and Eileen Attello (Case No. unassigned).

2. A Form U–4 or Uniform Application for Securities Industry Regulation or Transfer is a standard SEC-approved registration form containing an agreement to arbitrate any future exchange-related disputes.

incurred as a result of Fucilo's and Palladino's wrongful actions.

### C. *Proceedings Before the District Court*

On April 21, 2000, John Hancock filed eleven separate actions against the Investors.[3] In each, John Hancock sought a declaration that the parties had not entered into a valid arbitration agreement and a preliminary and permanent injunction staying the arbitration proceedings. The district court joined the cases for pretrial purposes on May 12, 2000.

In its complaints, John Hancock acknowledges that, as a member of the NASD, it is bound by the NASD Code to arbitrate certain disputes arising out of or in connection with its business. John Hancock argues, however, that the Investors' claims do not fall within the scope of the NASD Code because the promissory notes Fucilo sold to the Investors were in no way related to John Hancock's business and because the Investors were not customers of John Hancock at the time they purchased the promissory notes.

On May 30, 2000, the Investors moved pursuant to the Federal Arbitration Act (FAA) to stay the district court actions and compel arbitration. *See* 9 U.S.C. §§ 3 and 4. On August 1, 2000, the Investors filed an Amended Answer and Counterclaim, in which they generally denied the allegations in the Complaint and asserted as counterclaims the identical causes of action and sought the identical relief as they had in the arbitration proceedings. Rather than set forth those claims anew, the Investors attached and adopted the Statements of Claim that they had submitted to the arbitrators. The Investors stated that they would pursue their counterclaims "only if [the district court] or the arbitrators determine that the disputes between the parties are not arbitrable."

On September 11, 2000, the district court issued a decision from the bench granting the Investors' motion to compel arbitration, denying the Investors' motion to stay the action pending arbitration and dismissing John Hancock's complaint and the Investors' counterclaims in their entirety. As a threshold matter, the district court held that the parties had not manifested a clear and unmistakable intent to submit the question of arbitrability to the arbitrators. Accordingly, the district court undertook that determination, holding that John Hancock had agreed to arbitrate the Investors' claims by virtue of its status as an NASD member. The district court found that because Fucilo was an "associated person," John Hancock was bound by the NASD Code to arbitrate any disputes with the Investors "arising out of or in connection with" Fucilo's business. In addition, the district court held that "[b]ecause defendants expressly conditioned their counterclaims upon a determination that the disputes are not arbitrable, and, as noted, the Court has found the disputes to be arbitrable, the counterclaims are also dismissed" (internal citation omitted). Alternatively, the district court held that the Investors had violated Rule 8 of the Federal Rules of Civil Procedure because their Counterclaims did not contain a short and plain statement of their claims and prayer for relief. *See* Fed.R.Civ.P. 8(a) and (c).

---

3. John Hancock filed actions against Joseph Wilson (00–CV–0621), Louis and Mary DiMicco (00–CV–0622), Margaret Noll (00–CV–0623), James and Antoinette McNerlin (00–CV–0624), Laura Brown (00–CV–0625), Frank and Angeline Simpson (00–CV–0626), Michael and Susan Alecca (00–CV–0627), Warren Neals (00–CV–0628), Joseph and Eileen Attello (00–CV–0629), Joseph and Eunice Byczek (00–CV–0630) and Stanley and Teresa Melnik (00–CV–0631).

The Investors moved for reconsideration of the district court's denial of its motion to stay the action pending arbitration. On November 1, 2000, the district court issued a written decision and order denying the Investors' motion. The district court entered final judgment on November 8, 2000. After John Hancock and the Investors timely filed notices of appeal, we ordered an expedited briefing schedule on December 22, 2000, and heard oral argument on February 20, 2001.

## DISCUSSION

We first address whether the district court properly undertook the arbitrability determination. Because we hold that it did, we next discuss whether the district court properly compelled arbitration of the Investors' claims. Finally, we briefly address whether the district court erred in dismissing, rather than staying, the action pending arbitration.

### A. *Arbitrability*

At a glance, our resolution of the first two questions may seem inconsistent. We hold that John Hancock's membership in the NASD, without more, is not sufficient to show that the parties agreed to submit the question of arbitrability to the arbitrators, but that it is sufficient, without more, to bind John Hancock to arbitrate the Investors' claims.

The Supreme Court, however, requires that our analysis of these two questions be guided by opposing presumptions. "[T]he law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement.'" *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920,

131 L.Ed.2d 985 (1995). "[I]ssues of 'arbitrability' are presumptively for the court to decide," while "issues other than 'arbitrability' are presumptively for the arbitrator." *PaineWebber v. Elahi*, 87 F.3d 589, 595 (1st Cir.1996). We proceed with this important distinction in mind.

### 1. *Who Decides the Question of Arbitrability?*

■ "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir.1997); *PaineWebber v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir.1996) ("[W]here the arbitration agreement contains an ambiguity as to *who* determines eligibility, the [FAA's] presumption favoring arbitration is reversed so that the court will ordinarily decide the question.").

■ The district court found that "[b]ecause defendants are not parties to the NASD Code, they never agreed to allow the arbitrator to make this determination. Further, plaintiffs never agreed *with* defendants to allow the arbitrator to make this determination" (emphasis added). Consequently, the district court held that John Hancock and the Investors had not shown a clear and unmistakable intent to submit the issue of arbitrability to the arbitrators. We review that determination *de novo*. *See Burns v. New York Life Ins. Co.*, 202 F.3d 616, 620 (2d Cir.2000).

Notwithstanding prevailing on their motion to compel arbitration, the Investors claim that the district court erred by making that determination. They argue that the NASD Code evidences John Hancock's clear intent to submit arbitrability deter-

minations to the arbitrators. They rely primarily on Rule 10324 of the NASD Code, which provides that "[t]he arbitrators shall be empowered to interpret and determine the applicability of *all provisions* under this Code" (emphasis added). The Investors also rely on Rule 10106, which provides that "[n]o party shall, during the arbitration of any matter, prosecute or commence any suit, action, or proceeding against any other party touching upon any of the matters referred to arbitration pursuant to this Code."

#### a. *Clear and Unmistakable Intent*

In *Bybyk*, we interpreted and applied the Supreme Court's requirement that the parties evidence a "clear and unmistakable" intent to submit the issue of arbitrability to the arbitrators. 81 F.3d at 1198 (quotation marks omitted). We held that the parties evidenced such intent when they agreed that "any and all controversies are to be determined by arbitration." *Id.* at 1199 (holding that the phrase "any and all controversies" is "elastic enough to encompass disputes over whether a claim . . . is within the scope of arbitration").

In *Bybyk*, the parties had entered into an express client agreement that employed the "any and all" language. We concluded that the client agreement "evince[d] the parties' intent to submit issues of arbitrability to the arbitrators." *Id.* at 1196. In response to a PaineWebber argument, we also noted, in *dicta*, that even if the NASD Code had been incorporated by reference into the client agreement, "[t]he language of the [NASD] Code itself commits all issues, including issues of arbitrability and timeliness, to the arbitrators." *Id.* at 1202. *But see Merrill Lynch, Pierce, Fenner & Smith v. Cohen*, 62 F.3d 381, 384 (11th Cir.1995) ("We hold that [Rule 10324] is not 'clear and unmistakable evidence' of the parties' intent to allow the arbitrator

to determine the timeliness of the claim."). The Investors rely heavily on our *dicta* in *Bybyk*.

In addition, the Investors cite a litany of cases holding that parties may evidence a "clear and unmistakable expression of their intent to leave the question of arbitrability to the arbitrators" by adopting the provisions of the NASD Code. *E.g., Smith Barney Shearson v. Sacharow*, 91 N.Y.2d 39, 47, 666 N.Y.S.2d 990, 994, 689 N.E.2d 884, 888 (1997) (quotation marks omitted). In each of the cases cited by the Investors, however, the parties had entered into a separate, express agreement, that incorporated the broad language of the NASD Code. *See FSC Sec. Corp. v. Freel*, 14 F.3d 1310, 1312 (8th Cir.1994) (finding that "the parties expressly agreed to have their dispute governed by the NASD Code of Arbitration Procedure"); *Smith Barney v. Keeney*, 570 N.W.2d 75, 77 (Iowa 1997) ("[I]n the present dispute, the customer agreement incorporated by reference the provisions of the NASD code."); *Merrill Lynch, Pierce, Fenner & Smith v. Havird*, 335 S.C. 642, 518 S.E.2d 48, 50 (Ct.App.1999) ("[T]he agreement to arbitrate states: 'It is agreed that any controversy between us . . . shall be submitted to arbitration . . . conducted . . . pursuant to the Code of Arbitration Procedure of the [NASD].' "); *Smith Barney v. Bardolph*, 131 N.C.App. 810, 509 S.E.2d 255, 259 (Ct.App.1998)("Smith Barney drafted the Customer Agreement, including the arbitration clause, which stated that all controversies between the parties 'shall be determined by arbitration before the National Association of Securities Dealers, Inc., . . . in accordance with the rules of such body then obtaining.' "). *But see Weston Sec. Corp. v. Aykanian*, 46 Mass.App.Ct. 72, 703 N.E.2d 1185, 1190 (1998) ("[T]he case before us does *not* involve a negotiated arbitration clause in a commercial agreement.").

■ Neither our *dicta* in *Bybyk* nor the case law cited by the Investors answer the question presented by this appeal. Rather, they stand for the proposition that parties may overcome the *First Options* presumption by entering into a *separate agreement* that (1) employs the "any and all" language described in *Bybyk,* or (2) expressly incorporates the provisions of the NASD Code. Whether one party's membership in the NASD, in the absence of a separate agreement between the parties, can constitute a clear and unmistakable intent to submit the arbitrability of their disputes to the arbitrators remained open until now. Today, we hold that it cannot.

b. *The Need for an Express Agreement*

Our analysis is driven by the underlying rationale for the Supreme Court's decision in *First Options,* and guided both by our implicit holding in *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.,* 85 F.3d 21 (2d Cir.1996) ("*Spear, Leeds*"), and by the pronouncements of our sister circuits on a different but related question regarding the issue of arbitrability.

In *First Options,* the Supreme Court expressed concern that, if the general presumption in favor of arbitration were applied to the question of arbitrability, it "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." 514 U.S. at 945, 115 S.Ct. 1920. The Supreme Court sought to alleviate this concern by "revers[ing] the presumption" to favor judicial determinations of arbitrability questions. *Id.; see also Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 219–20, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (noting that the Arbitration Act's basic purpose is to "ensure judicial enforcement of privately made agreements to arbitrate").

The present case exemplifies the Supreme Court's concern. The NASD Code binds its members to arbitrate a wide variety of claims with a broad range of claimants. As we hold below, in some cases a third party with no direct relationship to the member can compel that member to arbitrate. *See, e.g., Spear, Leeds,* 85 F.3d at 26 ("[D]ecisional law recognizes that the FAA requires the enforcement of an arbitration agreement not just in favor of parties to the agreement, but also in favor of third party beneficiaries of the members' agreement to abide by the [New York Stock] Exchange's Constitution and Rules when they join."); *Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship,* 41 F.3d 861, 864 (2d Cir.1994) (customer "entitled to invoke [Rule 10301] as an intended third-party beneficiary"). The Investors' proposed approach would prohibit members from going to the courts to define, as a threshold matter, the outer limits of their obligations. John Hancock claims that under such a rule it would be required to submit to arbitration irrespective of "what the product might be, whether the claimant has any relationship with the NASD member, or the connection or lack thereof between the business of the NASD member and the dispute at issue." Although John Hancock may be required to submit to arbitration in such circumstances, we are bound by the principles articulated in *First Options* to preserve John Hancock's right to ask a court to make that determination.

We have reached the same result in the past, albeit without explanation. In *Spear, Leeds,* a member of the New York Stock Exchange (NYSE) filed an action seeking to enjoin arbitration proceedings instituted against it by three insurance companies. 85 F.3d at 24. The member and the insurance companies had "never directly contracted with one another." *Id.* at 26. The

defendants sought to compel arbitration based on the NYSE's arbitration provisions, which are substantially similar to the NASD Code provisions.[4] We held that the member must arbitrate the defendants' claims because the defendants were third-party beneficiaries of the NYSE membership agreement. *See id.* at 27. Prior to reaching that conclusion, however, we held that "[w]hether or not a matter is arbitrable is a matter for judicial determination." *Id.* at 25 (citing *AT & T Techs.,* 475 U.S. at 649, 106 S.Ct. 1415).

We glean additional indirect support from the statements of a number of our sister circuits. At present, the circuits are split over whether the six year time bar requirement of Rule 10304 of the NASD Code is an "arbitrability question."[5] *See Geneva Sec. v. Johnson,* 138 F.3d 688, 691 n. 1 (7th Cir.1998) (noting five-to-five split among circuits); *see also, e.g., Bybyk,* 81 F.3d at 1202 (holding that the time bar limitation is an "arbitrability question"). Here, it is beyond dispute that the parties pose an arbitrability question. We must determine whether that arbitrability question was properly resolved by the district court, rather than the arbitrators. The language used by our sister circuits in the course of their debate over the "time bar"

provision sheds light on how they might resolve the issue before us today.

■ For example, after holding that the time bar issues raised arbitrability questions, the Seventh Circuit held that *"[a]bsent an independent agreement* between [the parties] to the contrary, our precedent dictates that the parties did not agree to arbitrate the question of whether a claim was time-barred by Section 15." *Geneva Sec.,* 138 F.3d at 692 (emphasis added). Likewise, the First Circuit has stated that "certainly a party who did not sign the agreement did not consider who should decide arbitrability." *Elahi,* 87 F.3d at 599. Thus, in considering whether certain issues are questions of arbitrability, these courts have recognized that an express agreement is required to evidence a clear and unmistakable intent to remove arbitrability questions from judicial determination.

At least one other district court in this Circuit has anticipated our holding. *See Kidder, Peabody & Co. v. Marriner,* 961 F.Supp. 50, 53 (S.D.N.Y.1997). In *Marriner,* the district court was presented with the identical scenario that we faced in *Spear, Leeds* and that we face today, except under the American Stock Exchange (AMEX) Constitution.[6]

**4.** NYSE Rule 621 provides, in pertinent part, that "[t]he arbitrator(s) shall be empowered to interpret and determine the applicability of all provisions under this Code." NYSE Rule 600(a) provides, in pertinent part, that "[a]ny dispute, claim or controversy between a customer or non-member and a member ... and/or associated person arising in connection with the business of such member ... and/or associated person in connection with his activities as an associated person shall be arbitrated under the Constitution and Rules of the [NYSE] as provided by any duly executed and enforceable written agreement or upon the demand of the customer or non-member." We point out, however, that our holding in *Spear, Leeds* did not rest on the phrase "associated person in connection with his activities

as an associated person" (emphasis added). Our holding today interprets only the NASD arbitration provisions, which do not contain that phrase.

**5.** Rule 10304 provides, in pertinent part: "No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy."

**6.** The arbitration provisions of the AMEX Constitution are in all relevant respects identical to the NASD Code provisions. *See, e.g., Marriner,* 961 F.Supp. at 53. AMEX Rule 612(b) provides, in pertinent part, that "[t]he

Because the Supreme Court requires clear and unmistakable evidence that the parties wish to submit the issue of arbitrability to an arbitrator ..., and because the Second Circuit has implicitly found that no such evidence exists where the parties have an arbitration agreement by virtue of the firm's member ship in an exchange, I find that the Court, and not the arbitrator, must determine whether or not these matters are arbitrable.

*Id.; see also Zimring v. Coinmach Corp.,* 2000 WL 1855115, at *2 (S.D.N.Y. Dec.19, 2000) (no clear and unmistakable intent evidenced where party is not a signatory to contractual provision); *cf. In re Herman Miller, Inc.,* 1998 WL 193213, at *4 (S.D.N.Y. Apr.21, 1998) ("Where the party seeking arbitration is not a party to the arbitration agreement, the question of arbitrability is for the court, not the arbitrator."), *aff'd, Herman Miller, Inc. v. Worth Capital,* 173 F.3d 844 (2d Cir.1999) (unpublished table decision).

■ Today, we expressly hold that which we implied in *Spear, Leeds:* one party's membership in an exchange, is insufficient, in and of itself, to evidence the parties' clear and unmistakable intent to submit the "arbitrability" question to the arbitrators. Of course, we do not intend to limit the ability of an exchange to fashion rules that bind its members to present arbitrability challenges to the arbitrators. *See Spear, Leeds,* 85 F.3d at 30 (recognizing the importance of "allowing and facilitating vigorous self-regulation" by an exchange). To do so, however, it must either use clear and unmistakable language or prohibit its members from bringing such

challenges in the first place. Accordingly, absent an express agreement between the Investors and John Hancock incorporating the NASD Code or providing that "any and all" disputes be settled in arbitration, the district court properly undertook the determination of whether the Investors' claims are arbitrable.

### 2. *Scope of NASD Rule 10301*

■ Having determined that the district court properly undertook the arbitrability question, we now determine whether the district court answered that question correctly. Although it should go without saying, it is important to keep in mind that "the *validity* of [the Investors' underlying] legal argument is not pertinent to" our discussion. *Id.* at 28 (emphasis added). We determine only whether the Investors may compel John Hancock to defend their claims in the arbitral forum, not whether we "deem" those claims "meritorious." *United Steelworkers of America v. Am. Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). We express no view on the latter.

■ The district court held that the plain language of Rule 10301 encompasses disputes between customers and members arising out of the business of associated persons. It found that "what is important is that the [Investors] were customers of a person associated with [John Hancock]. Because [the Investors] were Fucilo's customers and Fucilo was associated with [John Hancock], this dispute is arbitrable." We review *de novo* a district court's determination that the parties agreed to arbitrate a given dispute. *See Burns,* 202 F.3d at 620.

arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." *See also* AMEX Rule 600(a) ("Members ... shall arbitrate all controversies arising in connection with their business ... between them and their customers as required by any customer's agreement or, in the absence of a written agreement, if the customer chooses to arbitrate.").

"Arbitration 'is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Bybyk*, 81 F.3d at 1198 (quoting *AT & T Techs.*, 475 U.S. at 648, 106 S.Ct. 1415). Thus, "[o]ur initial task is to determine whether [John Hancock] entered into an agreement to arbitrate." *Spear, Leeds*, 85 F.3d at 25. Here, John Hancock concedes that it agreed by virtue of its membership in the NASD to arbitrate all disputes contemplated under Rule 10301.

 Therefore, we proceed directly "to the second inquiry: whether the present dispute between [the Investors] and [John Hancock] falls within the scope of that agreement." *Id.* at 28. Whether a party is bound by an arbitration clause is governed by federal law. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir.1993). Nevertheless, "in determining whether the parties agreed to arbitrate [we] look[ ] to general state law contract principles for guidance." *Chelsea Square Textiles v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 296 (2d Cir.1999). Therefore, like the parties and the district court, we rely primarily on our prior precedent applying New York law.

 Like any other contract, courts must interpret an arbitration provision to give effect to the parties' intent as expressed by the plain language of the provision. *See Bybyk*, 81 F.3d at 1199; *Am. Express Bank Ltd. v. Uniroyal*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.") (citation omitted). Unlike most contracts, however, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Thomas James Assoc.*, 102 F.3d at 65.

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415 (internal quotation marks omitted).

 NASD Rule 10301(a) requires John Hancock to arbitrate "[a]ny dispute, claim, or controversy ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons ... upon demand of the customer." In determining that John Hancock must arbitrate the Investors' claims we need look no further than the plain language of Rule 10301, keeping in mind that any ambiguity in the language must be construed in favor of arbitration.

Rule 10301 can be broken down into two substantive parts. First, the Investors' claims must constitute a "dispute ... between a customer and a member and/or associated person." Second, the dispute must "aris[e] in connection with the business of such member *or* in connection with the activities of such associated persons" (emphasis added). The dispute is between the Investors and John Hancock, a NASD member. Even assuming that the Investors' claims do not relate to John Hancock's business, *but see First Montauk Sec. Corp. v. Four Mile Ranch Dev.*, 65 F.Supp.2d 1371, 1379 (S.D.Fla.1999) ("A dispute that arises from a firm's lack of

supervision over its brokers arises in connection with its business.") (internal quotation marks omitted), the parties do not dispute that the Investors' claims arise out of the activities of Fucilo, an associated person. Therefore, the only portion of Rule 10301 that could foreclose the Investors' right to arbitration on demand is whether the Investors are "customers" in the sense contemplated by the NASD Code.

■ John Hancock argues that the Investors must be customers of John Hancock and not merely of an associated person. In the district court's view, "the term 'customer' plainly refers to either the member['s] or the associated person['s] customer." We agree with the district court. There is nothing in the language of Rule 10301, or any other provision of the NASD Code, that compels us (or even suggests that we ought) to adopt John Hancock's narrow definition of the term "customer." In fact, the NASD Code defines "customer" broadly, excluding only "a broker or dealer." Rule 0120(g). The Investors are neither.

Even if we were to accept John Hancock's interpretation of Rule 10301, at best it would raise an ambiguity as to the definition of "customer." In the face of such an ambiguity, we would be compelled to construe the provision in favor of arbitration, *see Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927, unless we could say with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415 (quotation marks omitted); *see also Mehler v. The Terminix Int'l Co.*, 205 F.3d 44, 49 (2d Cir.2000), *petition for cert. filed,* 69 U.S.L.W. 3674 (U.S. Apr. 10, 2001). In our view, the clause is not only susceptible of an interpretation encompassing the Investors' disputes, but requires one. Therefore, in accordance with the firmly established principles discussed above, we hold that the district court properly compelled arbitration of the Investors' claims.

■ John Hancock argues that "there is not a single reported case that has interpreted Rule 10301 to require a member to arbitrate with a claimant where the claimant could only establish it was a customer of the associated person." *But see Wall St. Fin. Group v. Guthrie,* No. 8:00–1271 (M.D.Fla. Feb. 6, 2001) (order denying preliminary injunction) (incorporating prior finding that where defendants showed a customer relationship with an associated person and the dispute arose out of the associated person's business, district court could not find that "the arbitration provision at issue . . . is not susceptible of an interpretation in favor of arbitration"). Even if John Hancock's statement is true, it does not help it. No federal appellate court has prohibited the customer of an associated person, asserting a claim arising out of the associated person's business, from compelling a member to arbitrate under Rule 10301. *See, e.g., Miller v. Flume,* 139 F.3d 1130 (7th Cir.1998); *Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352 (2d Cir.1995).

For example, in *Oppenheimer*, we held that because the investors had "turned over their funds to Oppenheimer's [Vice President] so as to become customers of Oppenheimer," they had evidenced a sufficient customer relationship with Oppenheimer. *Id.* at 357. In doing so, we rejected Oppenheimer's argument that the investors must have opened accounts with Oppenheimer to be its customers. *See id.* John Hancock claims that, because we found a customer relationship between the investors and Oppenheimer under Rule 10301 in that case, we *require* a customer relationship between the member and the

claimant in all cases. One does not follow from the other. Our holding there does not limit our application of the NASD Code to the entirely distinct set of facts presented here any more than our finding that a confession is sufficient evidence of a murder forecloses a subsequent finding that the testimony of an eyewitness is sufficient as well. Our touchstone is the language of the NASD Code, which we must apply to the facts of the present case. The absence of any case law directly supporting our holding is the result of the rarity with which this factual scenario is presented to the courts and does not imply support for John Hancock's position.

In fact, most of the decisions relied on by John Hancock contain language that supports a broad interpretation of the term "customer." *See, e.g., WMA Sec. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D.Ohio 1999) ("The facts that [the customers] never had an account with [the member] and that the ... promissory notes in which both [customers] invested were not approved products of [the member] are irrelevant."); *WMA Sec. v. Wynn,* 191 F.R.D. 128, 130 (S.D.Ohio 1999) ("A Customer is defined as anyone who is not a broker or dealer. 'Customer' is not defined as WMA would have it, as a person who opened an account with a brokerage firm."); *First Montauk Sec.,* 65 F.Supp.2d at 1381 ("[The NASD Code] contain[s] no limitations other than exclusion of brokers and dealers from invoking rules relating to customers."). To the extent any of these cases *require* indicia of a direct customer relationship between the member and the customer, we reject them as contrary to the plain language of Rule 10301. *Cf. Investors Capital Corp. v. Brown,* 2001 WL 539455, *5 (M.D.Fla. May 21, 2001) (holding that to allow arbitration where there is no direct customer relationship with the member would "do significant injustice to the reasonable expectations of NASD members") (internal quotation marks omitted).

As our decision today is grounded in the plain language of the relevant provisions of the NASD Code, we do not delve into any extrinsic evidence regarding the NASD's intent. *See Int'l Klafter Co. v. Cont'l Cas. Co.,* 869 F.2d 96, 100 (2d Cir.1989). We note in passing, however, that we have reviewed John Hancock's additional arguments in that vein and find them inconclusive, at best.

B. *Dismissal or Stay*

The Investors argue that the district court erred by dismissing their counterclaims on the grounds that the counterclaims were conditional and, alternatively, improperly pled. In addition, the Investors claim that section 3 of the FAA requires that the district court stay the action pending arbitration.

■ We hold that the district court properly dismissed the Investors' counterclaims on the ground that they were conditional. As John Hancock aptly stated in a September 26, 2000 letter to the district court: "It was [the Investors] that asserted, *sua sponte,* that the Counterclaims were conditional on an adverse decision to their motion to compel arbitration." When the district court ruled in the Investors' favor on the arbitrability question, that self-imposed condition was not satisfied.

We do not reach the question of whether a counterclaim must meet the requirements of Rule 8 when a party brings an action for declaratory and injunctive relief to halt arbitration. Nor do we decide whether under different facts section 3 of the FAA requires the district court to stay the action pending arbitration. Accordingly, whether the Supreme Court's recent decision in *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), impacts our reliance

on the distinction between "embedded" and "independent" proceedings, *see, e.g., CPR(USA) Inc. v. Spray,* 187 F.3d 245, 253 (2d Cir.1999), and whether a counterclaim can transform an otherwise "independent" proceeding into an "embedded" proceeding are questions for another day.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order and judgment granting the Investors' motion to compel arbitration, denying the Investors' motion to stay the action pending arbitration and dismissing the complaint and counterclaims in their entirety.

KATZMANN, Circuit Judge, concurring:

John Hancock and Signator ably present an argument that, as a policy matter, has considerable force: because the record does not show the requisite indicia of customer relationship between them and the Investors, they should not be responsible for defending the Investors' claims before an NASD arbitration panel rather than in court. In other words, the Investors must be customers of Hancock and not simply of an associated person in order to be covered by NASD Rule 10301(a). Today the Court holds that, by a plain meaning analysis of Rule 10301(a), or in the alternative, by construing any ambiguity in favor of arbitration as the rules of construction require, the district court properly compelled arbitration of the Investors' claims. I believe that Rule 10301 is susceptible of more than one interpretation, but agree with the Court that the relevant presumption requires resolution of the ambiguity in favor of arbitration. No extrinsic evidence has been presented that, for example, the drafters of NASD Rule 10301(a) intended that an investor must be a customer of the member—and not just a customer of an associated person of the member—in order to force the member to arbitrate. In the

absence of such support, this Court is left with the words of the Rule: "[a]ny dispute, claim, or controversy ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code ... upon the demand of the customer." We are constrained by the rules of construction which we must apply to the language before us. We are without authority to venture beyond our province, and must leave the very legitimate policy issues identified by the appellants to those charged with developing and approving NASD policy. *See* 15 U.S.C. § 78s(b)(1)(requiring "self-regulatory organization[s]" such as the NASD to submit proposed policy changes to the Securities and Exchange Commission for public notice, comment and approval); 17 C.F.R. § 240.19b–4 (governing filings with respect to proposed rule changes by self-regulatory organizations).